UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TYNESHA K. ARMAND,

              Plaintiff,

      -v-

SGT. R. SIMONSON, C.O. JOSEPH PIERSMA,
UNKNOWN OFFICER(S), LT. FREDERICKS, C.O.
VINCENT C. SULLIVAN, INVESTIGATOR
MANYWITHER, C.O. T. THOMAS, and C.
PETTERSON, RN,

              Defendants.

Case No. 12-CV-7709 (KMK)

OPINION & ORDER

Appearances:

Tynesha K. Armand
New York, NY
*Pro Se*

Donald Nowve, Esq.
Steven Neil Schulman, Esq.
Office of New York State Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

      Plaintiff Tynesha K. Armand ("Plaintiff") brings the instant action against Correctional

Sergeant Randall Simonson ("Simonson"), Correctional Officer Joseph R. Piersma, Correctional

Officer Vincent C. Sullivan, Correctional Officer Tim Thomas, Correctional Lieutenant Niel

Fredericks, Nurse Charlotte Peterson ("Peterson"), and Investigator Norma J. Manywether

("Manywether") (collectively, "Defendants") pursuant to 42 U.S.C. § 1983, alleging violations

of her constitutional rights in connection with correctional officers' use of force during her

arrival at Fishkill Correctional Facility ("Fishkill").[1]  Defendants move for summary judgment on Plaintiff's Eighth Amendment claim against Peterson and, more generally, on the grounds that Plaintiff has not exhausted her administrative remedies pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).  For the reasons to follow, Defendants' Motion is granted part.

## I.  Background

### A.  Factual Background

The following facts are taken from Defendants' unopposed 56.1 statement and other documents contained in the record.[2]

---

[1] In her Amended Complaint, Plaintiff misspelled Manywether's and Peterson's names as "Manywither" and "Petterson" respectively.

[2] Under Local Rule 56.1, a party seeking summary judgment must submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local R. 56.1(a).  When opposing such motion, the nonmovant must similarly "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party."  *Id.* 56.1(b).  Although each statement not controverted by such a corresponding paragraph is deemed admitted, *id.* 56.1(c), where, as here, one of the parties has failed to file such a statement, a court "may in its discretion opt to conduct an assiduous review of the record," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (internal quotation marks omitted); *see also Holzworth v. Alfa Laval Inc.*, No. 12-CV-6088, 2016 WL 270450, at *2 n.3 (S.D.N.Y. Jan. 21, 2016) (same); *Clemmons v. Am. Airlines, Inc.*, No. 11-CV-928, 2015 WL 6830169, at *1 n.2 (S.D.N.Y. Nov. 6, 2015).  Additionally, where, as here, a motion for summary judgment is entirely unopposed, a court must "ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production" before summary judgment may be entered.  *Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014); *see also Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004) ("Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law."); *Clemmons*, 2015 WL 6830169, at *1 n.2 (same).  Mindful of the special solicitude owed to pro se plaintiffs, *see Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988), the Court elects to consider additional evidence contained in the record, *see Clemmons*, 2015 WL 6830169, at *1 (opting to exercise discretion to review record despite Rule 56.1 statement not being filed "[g]iven [the] [p]laintiff's pro se status"); *Pagan v. Corr. Med. Servs.*, No. 11-CV-1357, 2013 WL 5425587, at *2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d] considered the [motions for summary judgment] in light of the entirety of the record to afford

1.  Plaintiff's Alleged Assault and Treatment

On May 7, 2011, Plaintiff, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") in connection with her two- to four-year sentence for fourth-degree grand larceny, was transferred by van from Arthur Kill Correctional Facility ("Arthur Kill") to Fishkill, in order to be kept on "special watch" after the Office of Mental Health (the "OMH") reported that she threatened to harm herself.  (Defs.' Local Civil 56.1 Statement of Material Facts That Are Not In Dispute ("Defs.' 56.1")  ¶¶ 3–5 (Dkt. No. 104) (citing Counsel's Decl. of Steven N. Schulman ("Schulman Decl.") Ex. C ("Pl.'s Dep. Tr.") 16– 17 (Dkt. No. 109)); Schulman Decl. Ex. D (special watch log); Schulman Decl. Ex. E (Plaintiff's facility history); Schulman Decl. Ex. F (medical records); Schulman Decl. Ex. N (letter to inspector general); Decl. of Charlotte Peterson ("Peterson Decl.") ¶¶ 7–9 (Dkt. No. 108)).)³ According to Plaintiff, she had been wearing restraints on her arms, legs, and waist while in the van.  (*See* Defs.' 56.1 ¶ 6 (citing Am. Compl. 7–8 (Dkt. No. 44)).)⁴  Upon exiting the van, Plaintiff alleges that Defendants grabbed her by her foot restraints, pulling her to the ground and causing her to hit her head.  (*See id.* (citing Am. Compl. 7–8).)  Afterwards, she claims that she was dragged to a holding cell, tearing parts of her skin, before being turned upside down and thrown down a staircase, landing on her head.  (*See id.* (citing Am. Compl. 7–8).)  Plaintiff

_____

[the pro se] [p]laintiff the special solicitude to which he [was] entitled" where the plaintiff failed to submit a Rule 56.1 response).

³Many of the documents in the record use male pronouns to refer to Plaintiff; however, by letter dated June 25, 2014, Plaintiff informed the Court that Plaintiff was "a[ ]part of the [t]ransgender [c]ommunity, from [m]ale to [f]emale," and "request[ed] . . . [to] be address[ed] as such," (*see* Dkt. No. 69), and, on January 22, 2015, notified the Court that Plaintiff's name had changed from James to Tynesha, (*see* Dkt. No. 97).  Accordingly, the Court refers to Plaintiff exclusively by feminine pronouns.

⁴ A copy of the Amended Complaint is also attached to the Schulman Declaration as exhibit A.  (*See* Schulman Decl. Ex. A ("Am. Compl.").)

alleges that she later woke up in another holding cell located in the "infirmary." (*Id.* (citing Am. Compl. 7–8).) As a result, Plaintiff's head was pounding, and she suffered scrapes on her legs, back, elbow, and arm, although these injuries, she says, "overlapped" with assaults from other facilities. (*Id.* ¶ 7 (citing Pl.'s Dep. Tr. 125).) In contrast, she says that she suffered mental health symptoms for the first time shortly before she was transferred to Fishkill, but that her symptoms progressed at Fishkill. (*See id.* (citing Pl.'s Dep. Tr. 142).)

Plaintiff was placed in an observation cell in the Residential Crisis Treatment Program ("RCTP") Unit for the special watch and mental health treatment provided by the OMH. (*Id.* ¶ 8 (citing Peterson Decl. ¶ 9).) At approximately 3:45 a.m. on May 8, 2011, Defendants maintain, Plaintiff was examined by Peterson, who had been informed that Plaintiff, upon arriving at Fishkill, kicked a correctional officer, and had to be restrained. (*See id.* ¶¶ 9, 11 (citing, inter alia, Peterson Decl. ¶¶ 9–10).) According to Defendants, Peterson memorialized the examination in part through a note that read:

> 35 yo [year old] ♂ [male] OMH outcount from Arthur Kill c/o [complains of] minor discomfort @ cuff areas of bilet[earl] wrists. "I hurt my foot." small superficial wound to L [left] ankle area noted. No other sign of visible injury cleansed & abx [antibiotic] ointment applied[,] alert and communicative. Calm. Cont[inue] to monitor[,] submitted injury report.

(*Id.* ¶ 9, 11 (alterations in original) (citing, inter alia, Peterson Decl. ¶ 9) (quoting Peterson Decl. ¶ 10; Peterson Decl. Ex. F (medical records) 73).) Peterson's notes indicated that Plaintiff had no other complaints (including any complaints about head trauma), and appeared to be calmly sitting on the bed. (*Id.* ¶¶ 10, 12 (citing Am. Compl. 1; Peterson Decl. ¶¶ 11, 13).) Several hours later, between 7:20 a.m. to 7:30 a.m., according to the special watch log, Plaintiff was speaking with Nurse Schneider ("Schneider"), to whom Plaintiff said that she had been raped while at Arthur Kill. (*Id.* ¶ 13 (citing Schulman Decl. Ex. D (special watch log) 2–3, 23; Schulman Decl.

Ex. G (note from Schneider to Fredericks)).)  Shortly thereafter, at approximately 7:45 a.m.,

Peterson observed Plaintiff being interviewed by OMH nursing staff, and did not find her to be

in any distress.  (*Id.* ¶ 14 (citing Peterson Decl. ¶ 15; Schulman Decl. Ex. F (medical records)

69).)

In her deposition, Plaintiff makes a few assertions about Peterson.  According to Plaintiff,

after she was "dropped down the steps," she blacked out and woke up in a cell, where Peterson

"came through."  (Pl.'s Dep. Tr. 31–32.)  Plaintiff remembers Peterson "walking by" and

remembers telling her that Plaintiff was "extremely hurt" as Peterson was doing her rounds.  (*Id.*

at 100.)  Nevertheless, Plaintiff denied that Peterson ever treated Plaintiff when she was awake,

specifically testifying to the following:

> Q. . . . On the day of [the] incident [on] May 8, 2011, do you recall being examined
> in any place, be it in your cell or in the clinic, by Nurse Peterson[?]
>
> A. It is funny that, you know, she put down scrapes and stuff, but I don't remember
> her examining me at all.  Maybe she came in the cell when I was knocked out.  I
> don't know.  Me coherently, examining me, absolutely not.  I remember seeing her
> while she was doing her rounds, and she ignored me.
>
> Q. Do you remember her talking to you or—
>
> A. She ignored me.
>
> Q. Did she saying [sic] anything to you about your condition?  Did she say, what
> hurts you?
>
> A. She ignored me.
>
> Q. What did you say to her?  You say she ignored you.  What did you ask?
>
> A. I said, I am hurt.  Please help me.  My head is pounding.  I was thrown down
> the stairs.  She looked at me—and I was dragged.  She looked at me and just walked
> away.
>
> Q. Did she ever tell you that there was a problem, or that there was a superficial
> wound to your left ankle?

A.  No.  I didn't see that until I saw the medical records.

Q.  Do you remember her applying any antibiotic ointment?

A.  No.

Q.  Can you take a look at this document that was provided to you—

A.  No . . . I seen the document.  It is fabricated.  I would say CYA, cover your own ass, basically.

***

Q.  So your testimony is no, you don't recall Nurse Peterson—

A.  My testimony, factual testimony is no.  Nurse Paterson [sic] never treated me.

Q.  No ointment, no nothing?

A.  Nothing.  Absolutely nothing.

***

Q.  Did you ever see Nurse Peterson or have any contact with Nurse Peterson, other than what you testified to?

A.  No.

Q.  Why are you suing Ms. Peterson?

A.  For medical indifference.  Because she did not treat me when I needed to be treated.  She ignored me[;] that is why I am suing her.  She failed to provide me with care.

Q.  On May 9th, about 7:30 in the evening, do you remember speaking to Nurse Peterson and telling her that I don't have any discomfort or words to that effect?

A.  No, absolutely not.

Q.  Looking at the bottom, just look at this document produced to you as Armand Med, your medical record, page 69.  And on the very bottom, it has three entries.  The very bottom, you see that entry there.  Very bottom, the third, by Nurse Peterson.

A.  Yeah, I see it.

6

Q.  And would you agree that what it says there, whether you agree with what is written or not, but it does say on there that you denied discomfort.  Is that what it says?

A.  I am not going to agree to that.

Q.  I am not asking you to agree with that.  I am asking is that what is written there.

A.  I see what is written, but I am not going to agree with it.

Q.  I am not asking you to agree with it.  Is that what is written there?  Yes or no?

A.  That is what is fabricated on that document.

(Pl.'s Dep. Tr. 100–05.)  In contrast, in Plaintiff's Amended Complaint, she alleges that she

showed her wounds to Peterson.  Specifically, Plaintiff alleged therein:

> M[s.] Armand was not treated by any medical staff inference [sic] to [her] injuries.
> M[s.] Armand complained that [her] head was really hurting from being thrown
> down a flight of stairs[;] [s]he was completely ignored by C. Petterson [sic] RN.
> M[s.] Armand also showed many abrasion [sic] that were located on the Arm,
> Shoulders, Upper Legs, both Ankles to the nurse.

(Am. Compl. 8–9.)

Additionally, when asked, Plaintiff testified as to her physical injuries in the following

manner:

Q.  First of all, tell me.  I asked you some questions before about Nurse Peterson, what the records reflected about an ankle injury.  Tell me, in your own words, what you say was hurting you as a result of the Fishkill incident.

A.  My head was pounding.  I see a neurologist to this day.  I take Gabapentin for pain as well.

***

Q. . . . Let's stick to the physical injuries.  So you're saying as a result of the Fishkill injuries? [sic]

A.  I had scrapes all over my body.  I had scrapes on my legs.  Scrapes on my back, elbow, arm.  Multiple scrapes.

Q.  Tell me about, are you saying that the head pain or head symptoms occurred—were caused by what happened in Fishkill?

A.  I believe I had a head concussion, from what happened, and it wasn't treated. And then my head was slammed against a gate at Five Points.  So it is multiple traumas.  But since we are talking about Fishkill, yeah, I was dropped on my head. Flipped over and slammed on my head, in the staircase.

*** 

Q.  You said either just now, or last time, you had some kind of medicine—

A.  It wasn't as intense as Five Points—as Fishkill at all, no.  It was like a simple headache, from when they put my head against that wall.

Q.  At Arthur Kill?

A.  At Arthur Kill.  But the Fishkill head, he was unbearable [sic].  Because at that point, at Arthur Kill, I wasn't having no head problems at all.  No severe headaches that I get now.

(Pl.'s Dep. Tr. 124–26, 128.)

On May 8, 2011, an OMH nurse prepared an RCTP nursing assessment, which reflected that Plaintiff claimed to have been raped at Arthur Kill, and felt scared and distraught.  (Defs.' 56.1 ¶ 15 (citing Schulman Decl. Ex. H (OMH records) 33–34).)  The report indicated that Plaintiff was not on any psychiatric medications, and that the only pain she experienced in the past two months was on her left ankle.  (*Id.* (citing Schulman Decl. Ex. H (OMH records) 33–34).)  The report further indicated that Plaintiff was calm, coherent, and oriented as to place and person, although she was of the mistaken belief that the day was Wednesday, when, in fact, it was Sunday.  (*Id.* (citing Schulman Decl. Ex. H (OMH records) 33–34).)  As reported by Plaintiff, she had previously had a head injury, but it stemmed from a car accident four years earlier.  (*Id.* (citing Schulman Decl. Ex. H (OMH records) 33–34).)

Throughout the day, Plaintiff met with other prison officials concerning her alleged earlier rape, during which she gave statements touching upon her physical wellbeing: First,

8

sometime between 9:30 a.m. and 10:30 a.m., according to a statement recorded by Sgt. R. J. Fabrizio, Plaintiff reported that she had been raped at Arthur Kill, but then later said that it was, in fact, at Fishkill.  (*Id.* ¶ 16 (citing Schulman Decl. Ex. I (Fabrizio note)).)  However, when asked about this statement in her deposition, Plaintiff claims she did not answer the questions put to her by a "high ranking officer" who sought to interview her prior to her interview with Manywether.  (*Id.* (citing Pl.'s Dep. Tr. 49–50, 51; Schulman Decl. Ex. D (special watch log) 3).)  Second, at approximately 11:10 am, Plaintiff reported to Nurse Housman ("Housman") that she had been raped three days earlier at Arthur Kill and hit her forehead on a railing after being dragged from a van when arriving at Fishkill, even though Housman reported no marks on Plaintiff's forehead, and did not note any complaints about head pain or signs of head trauma.  (*Id.* (citing Peterson Decl. ¶ 17; Schulman Decl. Ex. D (special watch log); Schulman Decl.  Ex. F (medical records) 72; Schulman Decl.  Ex. J (injury report)).)  Housman did note, however, red marks on Plaintiff's wrists and a cut on Plaintiff's left ankle.  (*Id.* (citing Peterson Decl. ¶ 17; Schulman Decl. Ex. D (special watch log); Schulman Decl.  Ex. F (medical records) 72; Schulman Decl.  Ex. J (injury report)).)  Additionally, according to the report, Plaintiff complained of earlier rectal bleeding.  (*Id.* ¶ 17 (citing Peterson Decl. ¶ 17; Schulman Decl. Ex. D (special watch log); Schulman Decl. Ex. F (medical records) 72; Schulman Decl. Ex. J (injury report)).)  According to a report by Manywether, purporting to memorialize an interview with Plaintiff at 12:30 p.m., Plaintiff said that, upon arriving at Fishkill, she kicked a sergeant who was standing outside the transport van, and fell out of the van, landing on her stomach, after which time she was escorted to the reception area and sexually assaulted by two or three male staff members.  (*Id.* ¶ 19 (citing Schulman Decl. Ex. K (Manywether report)).)  The report did

not indicate that Plaintiff had sustained any head injuries. (*Id.* (citing Schulman Decl. Ex. K (Manywether report)).)

The Parties likewise dispute whether Plaintiff gave a statement to Manywether and State Police Investigator Joachim Fiebich ("Fiebich"): On June 19, 2011, Fiebich prepared a report detailing his investigation of Plaintiff's accusations, which indicated that, on May 8, 2011, Fiebich went to Fishkill with Manywether to investigate a sex crime. (*Id.* ¶ 20 (citing Schulman Decl. Ex. L (Fiebich report)).) During the interview, Fiebich reported that Plaintiff complained about being punched by a counselor at Ulster Correctional Facility, requiring stiches to her forehead. (*Id.* (citing Schulman Decl. Ex. L (Fiebich report)).) Plaintiff also said that, upon arrival at Fishkill, she was also beaten around the face and body (though she had no visible injuries), but did not mention having been sexually assaulted. (*Id.* (citing Schulman Decl. Ex. L (Fiebich report)).) The report indicates that Fiebich asked Plaintiff why she did not mention being sexually assaulted, to which Plaintiff responded that she was embarrassed. (*Id.* (citing Schulman Decl. Ex. L (Fiebich report)).) When told she had no visible injuries, Plaintiff said she wanted to end the interview, although she refused to sign a complaint against the correctional officers. (*Id.* (citing Schulman Decl. Ex. L (Fiebich report)).) Plaintiff, however, denied having spoken with Manywether and the "Caucasian investigator" who came with her, and, further, denied having told anyone that she was sexually assaulted, (*id.* ¶¶ 21–22 (citing Pl.'s Dep. Tr. 50, 60, 63)), although the special watch log indicates that Plaintiff was removed from her cell at 2:40 p.m. and taken to an interview room to speak with Manywether and Fiebich, (*id.* ¶ 18 (citing Schulman Decl. Ex. D (special watch log) 5)). After this purported interview, according to the special watch log, Plaintiff was brought back to her cell at approximately 4:00 p.m., (*id.* ¶ 18 (citing Schulman Decl. Ex. D (special watch log) 5)), and, shortly thereafter, at

approximately 4:35 pm, Housman and Nurse Odell reported that Plaintiff refused to be taken to the hospital for evaluation, (*id.* ¶ 23 (citing Peterson Decl. ¶¶ 19–20; Schulman Decl. Ex. D (special watch log) 5; Schulman Decl. Ex. F (medical records) 70–71)).

Over the course of the next few days, Plaintiff remained under special watch, and, according to Peterson, on the morning of May 9, 2011, was "resting in bed [without] complaint, denie[d] discomfort[,] [and] voice[d][, no] complaint." (*Id.* ¶ 24 (some alterations in original) (citing Peterson Decl. ¶ 22; Schulman Decl. Ex. F (medical records) 69).) Also, according to Nurse Marks ("Marks") and Nurse Simons ("Simons"), Plaintiff had no other complaints other than constipation on May 10 and 11, 2011. (*Id.* ¶ 25 (citing Peterson Decl. ¶¶ 23–24; Schulman Decl. Ex. F (medical records) 68).) Plaintiff's special watch was terminated on the afternoon of May 12, 2011, at which time she was transferred to the Special Housing Unit ("SHU") in connection with a misbehavior report. (*Id.* ¶ 27 (citing Schulman Decl. Ex. D (special watch log) 28; Pl.'s Dep. Tr. 57, 91).) In a note dated May 12, 2011, "apparently prepared in connection with the termination of the special watch," OMH Associate Psychologist B. Merino reported that Plaintiff appeared to be "in a good state of physical health," although she looked "noticeably thin," and further noted that her OMH "service level" was a 3, meaning that she "[n]eeds/may need chemotherapy . . . OR suffers from a mental disorder which is currently in remission and can function in a dormitory facility which has part-time Mental Health staff." (*Id.* ¶ 26 (alterations in original) (citing Schulman Decl. Ex. H (OMH records) 24, 106–07).) Similarly, when Plaintiff was admitted to the SHU and later during her stay there, Nurse Spaight ("Spaight") found Plaintiff had no visible signs of injury, had no complaints other than a history of chronic constipation, and had no findings or history of a recent head injury. (*Id.* ¶ 27 (citing Peterson Decl. ¶ 27; Schulman Decl. Ex. D (special watch log) 28; Schulman Decl. Ex. F

(medical records) 66, 166–66A).)  As will be discussed, there is some uncertainty surrounding what steps Plaintiff undertook to submit a grievance while there.

On May 17, 2011, Plaintiff was transferred from Fishkill to Five Points Correctional Facility ("Five Points"), briefly stopping at Downstate Correctional Facility.  (*Id.* ¶ 31 (citing Pl.'s Dep. Tr. 58–59; Schulman Decl. Ex. E (Plaintiff's facility history)).)  On that day, Plaintiff was observed by two nurses.  (*Id.* ¶ 31 (citing Schulman Decl. Ex. F (medical records) 4–5, 65).)  Notes from one nurse's observation of Plaintiff at 5:20 p.m. indicated the nurse saw no bruises or evidence of trauma, (*see* Schulman Decl. Ex. F (medical records) 4–5), and the notes from the other observation say in part, "viewed in boxers— Ø visible injuries," (*id.* at 65).  Plaintiff was again seen on May 20, 2011.  (Defs.' 56.1 ¶ 31 (citing Schulman Decl. Ex. F (medical records) 65).)  Those notes are silent as to any injuries observed on Plaintiff.  (*See* Schulman Decl. Ex. F (medical records) 65.)  Notwithstanding the fact that these nurses did not observe any injuries, in a letter dated June 27, 2011, Plaintiff indicated (1) that her transfer from Arthur Kill to Fishkill led to a "series of event[s] . . . [that] [she] would rather say in person," (2) that "every[ ]time [she is] moved[,] [she] [is] attack[ed], (3) that "[i]t ha[d] been a month[,] [and] [her] [i]ndex finger is still broken and infected, [her] hair was snatch[ed] out [of] [her] scalp, [and] [her] elbow still hurts," and (4) "they have [Plaintiff] in the mental unit[] to cover up something, to make [it] seem that [Plaintiff] is mentally disable[d]."  (Schulman Decl. Ex. N, at unnumbered 2–3.)

On July 19, 2011, Plaintiff was transferred to Southport Correctional Facility ("Southport").  (Defs.' 56.1 ¶ 33 (citing Schulman Decl. Ex. E (Plaintiff's facility history)).)  While there, on August 24, 2011, Plaintiff wrote a letter to DOCCS's Inspector General's Office, alleging that she had been beaten or otherwise physically abused at Arthur Kill, Fishkill, Five Points, and, further, that she was retaliated against for her complaints while at Southport.  (Defs.'

56.1 ¶ 35 (citing Schulman Decl. Ex. O (Aug. 24, 2011 letter).)  In response to this letter, the inspector general opened an investigation, in connection with which Plaintiff was interviewed on November 5, 2011, but which was ultimately recommended to be closed as unsubstantiated. (*See id.* (citing Schulman Decl. Ex. O (investigative report)).)  Similarly, by memorandum dated October 5, 2011, Manywether recommended closing an investigation—which, according to the report, was initiated when Plaintiff reported a sexual assault to medical staff—as unsubstantiated with respect to the alleged events at Fishkill.  (*Id.* ¶ 38 (citing Schulman Decl. Ex. Q (Manywether report)); *see also* Schulman Decl. Ex. Q (Manywether report).)

Finally, on September 14, 2012, Plaintiff was transferred from Southport to Auburn Correctional Facility, from which she was released on parole on December 20, 2012.  (*Id.* ¶¶ 39– 40 (citing Schulman Decl. ¶ 20; Pl.'s Dep. Tr. 103; Schulman Decl. Ex. E (Plaintiff's facility history)).)

### 2.  Plaintiff's Grievances

Plaintiff makes several assertions concerning her efforts to file a grievance over the events at Fishkill.  First, in her deposition, Plaintiff claims that, while she was in the SHU, she completed an inmate grievance form that she obtained from another inmate, and that she left the form at the door to her cell to be picked up by an officer.  (*Id.* ¶ 28 (citing Pl.'s Dep. Tr. 117).) In part, her testimony reads:

> Q.  I want to ask you, at any time, did you file a grievance, an inmate grievance, concerning what you say happened to you at Fishkill on May 8, 2011?
>
> A.  When I was in the SHU, like I said to Judge Karas, and I wrote a letter in reference to that.  And you already know why it wasn't dismissed.  Yes, my neighbor, cellmate that didn't even know me, provided me with the supply.  And yes, I did put a letter to the grievance officer and another letter to the superintendent. At the door—whatever happens to that letter between my door and the mailbox is not up to me.  The officers control that.  I am quite sure you have a situation where,

you know, quite sure, you know, when officers, when you are in the SHU, handles all mail.  I don't have access to the mailbox, okay, at all.

Q.  And you wrote that out while you were still at Fishkill?

A.  Still at Fishkill.  Yes, I did.

(Pl.'s Dep. Tr. 112–13.)  Later, during Plaintiff's deposition, she again alluded to having left a

grievance in the door while at Fishkill:

Q.  If there [are] any correspondences you happen to have written when you were at Five Points about Fishkill.

A.  Yeah.  That is what I am saying to you.

Q.  I would like those.

A.  I don't have anything when I was at Fishkill.  When you put the thing at the door, the officers do whatever with it.  It is not up to me.

(*Id.* at 117.)  Nevertheless, when asked during her deposition, she brushed off the notion that

Defendants had discouraged her from filing grievances:

Q.  Are you claiming in any way the defendants, other of [sic] the defendants you have brought into this lawsuit, did anything that you feel prevented you from pursuing your grievance?

A.  What do you mean?  Of course.  You talking [sic] about the defendants exactly?

Q.  In this lawsuit, yes.

A.  What I can say is, when I got to the SHU, if they exhibit me not being able to put my grievance in the mail is [sic] not up to me.  If they did it themselves, these particular defendants, I can't say yes to that.  But yes, officers do talk to each other.  They just like colleagues, talk to each other.  So if they know that I had a situation with an officer, of course, they are going to react [to] that.  That is what they do.

Q.  You didn't see any of them remove your papers?

A.  No, because I was all the way in the first cell.  I was right by the event—exit door.

14

Q.  Did any of them say to you—again, these are defendants in this case.  Did any of them say to you, in substance, you better not file a grievance, or anything like that?

A.  Whatcha mean?

Q.  Just what I said.  At any time when you were in SHU at Fishkill after this incident.

A.  Oh, no.  They only said [sic] while I was at Five Points, not at Fishkill.

(*Id.* 118–19.)

This assertion more or less lines up with Plaintiff's claim as stated in her Amended Complaint, in which she alleges that, "[w]hile at Fishkill . . . [,] [she] was ignored by [c]orrectional [s]taff in asking for supplies and [g]rievance forms after [her] [t]ransfer[] from the [i]nfirmary into the SHU," but that, because she "wanted to report the assault[] [s]he endured upon arrival at Fishkill," Plaintiff "managed to borrow a pen and a paper from [her] neighbor[,] [and] wrote out [her] complaint," which [s]he "place[d] . . . in the crack of the cell door."  (Am. Compl. 6.)

Finally, Plaintiff further describes her efforts to have filed a grievance at Fishkill in a letter to the Court dated January 28, 2014, which says in pertinent part:

> The fact of the matter is that M[s]. Armand did not have physical access to the mailbox at Fishkill Correctional Facility or any other facilities afterward d[ur]ing the al[l]otted time period to file a Grievance.  Inmates placed in SHU have to depend on Correctional Staffs meaning Officers to handle their mails and etc……  Since M[s]. Armand was denied supplies form Officers d[ue] to being labeled a "RAT" [s]he relied on [her] neighbors.  So if the Officers that handle the plaintiff mail [sic] deposes [sic] or destroyed it, nothing can be done by the Plaintiff.  On September 10th,[ ]2013 your Honor posed a question in reference to the grievances filed by the Plaintiff and []Plaintiff responded it was given to the officers to mail.

(Schulman Decl. Ex. M (letter from Pl. to Court (Jan. 28, 2014)) 2.)[5]

---

[5] Exhibit M is the same document that appears at Dkt. No. 50.

In any event, there is no record of Plaintiff filing an inmate grievance at Fishkill. (Defs.'
56.1 ¶ 30 (citing Decl. of Sally A. Reams ("Reams Decl.") ¶¶ 2–3 (Dkt. No. 106)).) Regarding
the existence of any such grievance, Defendants offer affidavits from several employees: First,
according to Michelle P. Stone, Fishkill's Inmate Grievance Program ("IGP") supervisor in
2011, Plaintiff attempted to file a grievance at Fishkill while she was an inmate at Southport.
(Decl. of Michelle P. Stone ("Stone Decl.") ¶ 2 (Dkt. No. 107).) As Stone tells it, that grievance
was returned to Plaintiff with a memorandum informing her that, pursuant to Directive #4040,
grievances can be filed only at the facility where the inmate is currently being housed. (*See id.* &
Stone Decl. Ex. A; *see also* Defs.' 56.1 ¶¶ 34, 36 (citing, inter alia, Stone Decl. ¶ 2; Schulman
Decl. ¶ 17; Schulman Decl. Ex. P (grievance documents)).) Stone's declaration further
forecloses the possibility that Plaintiff's submission was, in fact, an inquiry into a previous,
missing grievance, as, she says, "[i]f [Plaintiff's] correspondence had been an inquiry into the
status of an inmate grievance claimed to have been previously filed at Fishkill, I would have
responded to such an inquiry in the memorandum." (*Id.* ¶ 3.)[6] Similarly, in her affidavit, Sally
Reams, another IGP Supervisor at Fishkill, indicated that she conducted a review for grievances
filed by Plaintiff in 2011 and 2012, but found nothing, other than Stone's August 24, 2011
memorandum to Plaintiff. (*See* Reams Decl. ¶¶ 2–3.)

---

[6] Plaintiff lodged no objection to this assertion; however, it is admissible even as non-
expert testimony because Stone was familiar with relevant procedures through her employment
as Fishkill's IGP supervisor. *Cf. Shelley v. White*, No. 09-CV-662, 2010 WL 1904280, at *2
(M.D. Ala. May 10, 2010) (finding warehouse supervisor could testify as lay witness concerning
his employer's "safety policies and procedures," and concluding that the "[Federal] Rule [of
Evidence] 702 [dealing with expert witnesses] does not apply to opinion which [he] might
express regarding the safety procedures at [his employer], and whether certain actions did or did
not violate those procedures, because they are based upon his knowledge gained from his
experience as an employee and shift supervisor, and not based on scientific, technical, or
specialized knowledge").

In addition, the evidence shows that Plaintiff did not file a grievance related to the Fishkill incident at any other correctional facility.  First, in contrast with Plaintiff's lack of success filing a grievance related to the Fishkill incident, the evidence shows that Plaintiff did successfully file at least some grievances while at Southport.  To that end, Defendants submit a document attached to a declaration in support of their Motion entitled "Southport Correctional Facility Inmate Grievance Program," which indicates that Plaintiff filed seven grievances, logged under the following headings on the following dates:

- "Missing Property" (August 3, 2011)

- "Wants Elbow X-Rayed" (August 9, 2011)

- "Alleges Harassment" (January 9, 2012)

- "Alleges Retaliation" (January 25, 2012)

- "Property Missing" (March 12, 2012)

- "Questions Lab Work" (May 17, 2012)

- "Harassment" (June 6, 2012)

(Schulman Decl. Ex. P (grievance documents) 1.)

Additionally, Defendants attach a declaration from Jeffrey Hale ("Hale") in a matter pending before the Eastern District of New York.  (Schulman Decl. Ex. R ("Hale Decl.") ¶ 1.) Hale is the Assistant Director of the IGP for DOCCS, in which role he is the custodian of the records maintained by the Central Office Review Committee ("CORC"), which, as will be explained, is the body that renders final administrative decisions under DOCCS's grievances framework.  (*Id.*)  According to Hale, he reviewed CORC's records to determine when Plaintiff appealed grievances to the CORC and found that Plaintiff had done so on three occasions.  (*Id.*

¶ 5.)  Hale has attached a print-out of DOCCS's records, which, identifies the grievances by the following labels, and notes that they were filed on the dates indicated below:

- "Retaliation" (January 25, 2012)

- "Questions Lab Work" (May 17, 2012)

- "Harassment By Staff" (June 6, 2012)

(*Id.* Ex. A.)

Nevertheless, Plaintiff makes a number of allegations that suggest her failure to grieve the Fishkill incident was not of her own choosing, inasmuch as the actions of certain correctional officers dissuaded her from filing a grievance about the events at Fishkill after her transfer to Five Points.  According to Plaintiff, when she arrived at Five Points, she was "assaulted by staff again," and that, "while this was taking place[,] one of the two Supervising Officers placed a knife on to Plaintiff['s] face and threaten Plaintiff [sic]."  (Am. Compl. 6.)  Although Plaintiff does not explicitly allege that these actions were undertaken to dissuade her from filing grievances, she includes them in her Amended Complaint under the heading "grievances filed." (*Id.*)  In her deposition, Plaintiff also describes an assault upon arrival at Five Points:

Q.  Where was the first place you went to when you arrived at Five Points, the very first location?

A.  I was in a holding cell, by myself.

Q.  And where did you go from the holding cell?

A.  From the holding—that incident had to do with Five Points, has nothing to do with Fishkill.

Q.  I am asking when you arrived at Five Points, after Fishkill.

A.  The Five Points is in front of the Eastern District.

Q.  I am not asking you about a Five Points incident.

A.  That is what you are asking me.  I was assaulted upon arrival.  That is what I have to say a about [sic] Five Points.

(Pl.'s Dep. Tr. 106–07.)  Following this incident, Plaintiff alleges that she was instructed not to report that she was injured:

Q.  At Five Points, did they do like an intake process for you?

A.  While I was at Five Points.

Q.  —when you first got there?

A.  When I first got there, a mental health nurse came and asked me questions.  And I told her I should be home.  But when I went to see medical, that is after I was assaulted.  They brought me to the medical unit.  Yes, they did.

Q.  Did you ever tell anybody at Five Points, I don't have any injury?

A.  I was terrified.  Terrified.

Q.  But did you deny that you had any injuries?

A.  I was terrified.  They told me, you better not say that you are hurt, and I followed their demand.

\*\*\*

A.  Do you want me to go into detail, how I was assaulted at Five Points?

Q.  Not at all.

A.  And they told me I better not say anything when I went to medical, and I did just that.

(*Id.* at 107–08, 110.)  However, Plaintiff alleges that, notwithstanding this assault, she wrote letters to follow up on her grievance at Fishkill:

Q.  When you got to Five Points . . . , did you do anything to follow up [on] what you say was a grievance you filed back at Fishkill?  Did you make any inquiry, ask anybody, or write any letters?

A.  At Five Points, like I said, I was attacked upon arrival, seriously attacked upon arrival.  And yes, yes, I did.  Yes, I did.  The officers refused to give you, like I

said, supplies.  I wrote that in the grievance.  My property wasn't transferred to me
until after the fact.  Yes, I did send letters out.  Yes, I did.

Q.  Who did you send the letters to?

A.  I sent letters to Fishkill.  And I think I provided to you those documents within
the Eastern District, a copy of that.  I wrote to Albany.  I sent letters to the grievance
[sic] in reference to what happened there.  I followed up with the grievance [sic]
and also to refile a grievance again, just in case they didn't get to file a complaint;
so yeah.

(*Id.* at 114–15.)  Plaintiff's testimony also indicates that the Five Points staff was upset over past

legal proceedings Plaintiff had initiated, and knew about her allegations concerning Fishkill.

Specifically, Plaintiff testified:

Q.  Well, when you were at Five Points, did you discuss this incident with any Five
Points inmates?

A.  Oh, Five Points, they was livid, at Five Points.  They was livid.  The officers
were livid at Five Points.  I guess this is why they attacked me.  This all resolved
[sic] of filing a claim—writ of habeas corpus to be released from prison, because I
was never delivered to Willard.  They was pissed about that.

Q.  You still didn't answer my question.  While were you [sic] at Five Points, just
yes or no, did you discuss the Fishkill incident with any Five Points inmates, yes or
no?

A.  I didn't, but the officers did, loudly.  I didn't have to; the officers did.

(*Id.* at 121–22.)[7]

   Despite the apparent lack of grievances she filed at Five Points, Plaintiff sent a letter

while there, dated June 27, 2011, and received by the Inspector General's Office on June 30,

2011.  (Schulman Decl. Ex. N (letter to inspector general), at unnumbered 1.)  According to that

---

[7] After this line of questioning, Defendants' attorney said, "[j]ust for the record, we will
be reserving our right to strike as nonresponsive, those portions of the plaintiff's testimony that
we believe are nonresponsive."  (Pl.'s Dep. Tr. 122–23.)  However, Defendants made no such
objection, and, in any event, had Plaintiff cited this testimony, Defendants could not argue that
the assertion "[could not] be presented in a form that would be admissible in evidence."  Fed. R.
Civ. P. 56(c)(2).

letter, when Plaintiff was transferred from Arthur Kill to Fishkill, "a series of event [sic] happened as well I would rather say in person."  (*Id.*, at unnumbered 2.)  Additionally, in what may well be a reference to the events underlying her alleged assault upon arrival at Five Points, Plaintiff wrote:

> Well finally I arrived at Five Point Correctional Facility where I received a tier III for violent conduct 104.11, interference with [illegible], refusing direct order 106.10 which resulted me in [sic] remaining in the S.H.U. with some injuries that I was to[o] afraid to report.  I would like to go into great detail with someone A.S.A.P.

(*Id.*, at unnumbered 2–3.)

B.  Procedural History

Plaintiff first filed this action on August 25, 2011 against a largely different lineup of defendants in the Eastern District of New York, but including Simonson.  (*See* Dkt. No. 1.)  On December 14, 2011, Judge Garaufis dismissed certain portions of Plaintiff's complaint, and referred the matter partially to Magistrate Judge Pollack for a recommendation as to whether certain of Plaintiff's claims should be transferred to the Southern District of New York.  (*See* Dkt. No. 6.)  Shortly thereafter, Plaintiff submitted a number of letters to Judges Garaufis and Pollack, (*see* Dkt. Nos. 8–19), requesting, among other things, for counsel to be appointed on her behalf, (*see* Dkt. No. 8), to amend her complaint, (*see* Dkt. No. 10), and for "some type of help," (*see* Dkt. No. 13).  On April 18, 2012, Judge Pollack recommended, among other things, that Plaintiff's claims against Simonson be severed and transferred to the Southern District of New York, and that Plaintiff's motion to amend her complaint be denied with leave to refile in this District.  (*See* Dkt. No. 20.)  Shortly thereafter, Plaintiff filed additional letters, including one nominally directed to an acting justice of the New York State Supreme Court in Albany, New York, (*see* Dkt. No. 21), an "answer" to Judge Pollack's report and recommendation, (*see* Dkt.

21

No. 22), and a request to amend her complaint to seek a greater quantum of damages, (*see* Dkt. No. 23).  Judge Garaufis adopted Judge Pollack's report and recommendation in full.  (*See* Dkt. No. 26.)  On October 19, 2012, the case was transferred in part to the Southern District of New York, and, on November 28, 2012, reassigned to this Court.  (*See* Dkt. Nos. 27–28.)

On March 19, 2013, Plaintiff submitted a letter to the Court requesting that opposing counsel only communicate with her "via correspondences," asking the Court to "take notice" that Plaintiff had not received "any notice or an Answer" for Simonson, which, Plaintiff indicated, was due on March 15, 2013, and further informing the Court that Plaintiff opposed "any future Pre-Motion conference" because she was "on [p]arole[] until 2014" and would "need special arra[nge]ments and permission prior to any Pre-Motion conference."  (*See* Dkt. No. 37.)  On March 18, 2013, by memo-endorsement on a March 13, 2013 pre-motion letter from Simonson's counsel, the Court scheduled a pre-motion conference for May 16, 2013, and further directed Plaintiff to explain by March 29, 2013 why she could not attend such conference.  (*See* Dkt. No. 38.)  By letter dated March 22, 2013, Plaintiff informed the Court that she gave notice of the May 16, 2013 conference to her parole officer, and would be allowed to attend court proceedings after that date with advanced notice.  (*See* Dkt. No. 39.)  At the May 16, 2013 conference, Plaintiff was granted leave to file an amended complaint by May 31, 2013, (*see* Dkt. (minute entry for May 16, 2013)), a deadline subsequently extended to June 10, 2013, (*see* Dkt. No. 40).

Shortly thereafter, Plaintiff submitted a letter dated July 11, 2013 to the Court, directed to Assistant Attorney General Donald Nowve ("Nowve"), Simonson's counsel, informing him that Plaintiff "decline[d] to [a]mend [her] Complaint," due to  Nowve's failure to provide Plaintiff with certain information.  (*See* Dkt. No. 41.)  The Court held a conference on September 10, 2013, at which the Court directed Plaintiff to submit a letter by September 24, 2013, providing

all relevant information about certain John and Jane Doe defendants that Plaintiff sought to include, further providing that Simonson was to respond by October 8, 2013 and that Plaintiff could then file an amended complaint by November 15, 2013.  (*See* Dkt. (minute entry for Sept. 10, 2013).)  By letter dated October 7, 2013, Nowve informed the Court that, pursuant to a request from Plaintiff, Simonson had provided Plaintiff with a duplicate copy of her responses to an earlier set of interrogatories, in response to which Plaintiff identified six new defendants whom she wished to include, obviating the need for a response from Simonson.  (*See* Dkt. No. 42.)  By letter dated September 20, 2013, Plaintiff detailed her proposed amended complaint, (*see* Dkt. No. 43), and, on November 7, 2013, she filed it, (*see* Dkt. No. 44).  On November 7, 2013, Plaintiff requested pro bono counsel, (*see* Dkt. No. 45), which the Court denied without prejudice on May 7, 2014, (*see* Dkt. No. 56).

By letter dated January 8, 2014, Simonson requested a pre-motion conference in advance of his anticipated motion to dismiss on the grounds of Plaintiff's putative failure to exhaust her administrative remedies under the PLRA, in response to which the Court directed Simonson to further elaborate as to how the Complaint could be dismissed by considering documents beyond the pleadings.  (*See* Dkt. No. 49.)  After Simonson's response, (*see* Dkt. Nos. 51), the Court held a pre-motion conference on May 2, 2014, (*see* Dkt. (minute entry for May 2, 2014)).  On May 8, 2014, Simonson informed the Court that he would not seek dismissal at that time.  (*See* Dkt. No. 57.)

On July 7, 2014, the Court held a conference, at which it set a discovery schedule.  (*See* Dkt. No. 71; Dkt. (minute entry for July 7, 2014).)  Additionally, by letter dated July 11, 2014, Plaintiff requested to withdraw her claims against Manywether without prejudice, relief which the Court granted.  (*See* Dkt. Nos. 72–73.)

By letter dated September 29, 2014, Defendants requested that Manywether be terminated *with* prejudice, as Plaintiff agreed to Manywether's dismissal without prejudice but then served Manywether with the amended complaint anyway.  (*See* Dkt. No. 80.)  Pursuant to the Court's direction, (*see* Dkt. No. 82), Plaintiff responded, requesting that the dismissal be without prejudice, and the Court instructed Defendants to explain by October 24, 2014 why the dismissal could not be without prejudice, (*see* Dkt. No. 86).  Defendants agreed that the dismissal could be without prejudice, (*see* Dkt. No. 87), which the Court approved by memo-endorsement on October 27, 2014, (*see* Dkt. No. 88).  Defendants answered on November 14, 2014.  (*See* Dkt. No. 91.)

On January 13, 2015, Defendants submitted a pre-motion letter in advance of their anticipated Motion for Summary Judgment, (*see* Dkt. No. 93), the Court addressed at a conference on January 22, 2015, (*see* Dkt. (minute entry for Jan. 22, 2015)).  After two extensions of time, (*see* Dkt. Nos. 99, 101), Defendants filed their Motion and accompanying papers on March 20, 2015, (*see* Dkt. Nos. 102–10), including notice to Plaintiff pursuant to Local Rule 56.2, (*see* Dkt. No. 103).  Thereafter, on three separate occasions, Plaintiff requested and received extensions of time to respond, which the Court approved, (*see* Dkt. No. 111–14), ultimately extending Plaintiff's time to respond by an additional 14 days after her final June 24, 2015 request, (*see* Dkt. No. 114).  Nevertheless, Plaintiff did not respond, and, by letter dated August 14, 2015, Defendants requested that Plaintiff's motion be deemed fully submitted, (*see* Dkt. No. 117), which the Court approved on August 17, 2015, (*see* Dkt. No. 118).  Finally, on September 3, 2015, Plaintiff submitted a "letter . . . on a sensitive matter," indicating that Plaintiff was "[]no[] longer able to advocate for [her]self as a pro-se plaintiff" and "advis[ing] that [she] [would] be submitting documents 'medical document,' [sic] supporting [her]

24

statements," and further requesting that her "case and complaint . . . continue moving forward with assistance." (Dkt. No. 119.)

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same). "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alterations and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that [her] allegations were correct; [s]he need[s] to

'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. Cty. of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of N.Y.*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009)).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).  At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, MDL No. 1358, No. M21–88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks removed) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).  Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988); *Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and internal quotation marks omitted).

### B.  Analysis

In their Motion, Defendants request that the Court (1) terminate Manywether from the docket, (*see* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem.") 7–8 (Dkt. No. 105)), and enter summary judgment (2) as to Peterson on the grounds that she (a) was not deliberately indifferent to a substantial risk of serious harm in providing medical care to Plaintiff, and (b) is, in any event, protected by the doctrine of qualified immunity, (*see id.* at 9–17), and (3) as to all Defendants on the grounds that Plaintiff failed to exhaust her administrative remedies, (*see id.* at 17–25).

#### 1.  Eighth Amendment Claim

Defendants seek summary judgment on Plaintiff's Eighth Amendment claim against Peterson.  (*See* Defs.' Mem. 11–16.)  "The Eighth Amendment forbids deliberate indifference to serious medical needs of prisoners."  *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (internal quotation marks omitted).  "There are two elements to a claim of deliberate indifference to a serious medical condition."  *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009).  "The first requirement is objective:  the alleged deprivation of adequate medical care must be sufficiently serious,"  *Spavone*, 719 F.3d at 138 (internal quotation marks omitted), which requires that "the prisoner must prove that his [or her] medical need was a condition of urgency, one that may produce death, degeneration, or extreme pain," *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (internal quotation marks omitted); *see also Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).  Analyzing this objective requirement requires two inquiries.  "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (same).  The second inquiry is "whether the inadequacy in medical care is sufficiently serious.  This inquiry requires the court to examine

how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* at 280. "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003); *see also Santana v. City of N.Y.*, No. 13-CV-3034, 2014 WL 1870800, at *5 (S.D.N.Y. May 8, 2014) (same). However, the Second Circuit has cautioned that the analysis operates somewhat differently depending on whether the inmate is alleging that that medical care was simply delayed, or fully denied. As the Second Circuit explained:

> Th[e] [objective] inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious . . . . In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.

*Salahuddin*, 467 F.3d at 280 (alterations, citations, and internal quotation marks omitted); *see also Davis v. McCready*, No. 14-CV-6405, 2016 WL 796847, at *4 (S.D.N.Y. Feb. 22, 2016) (same).

"The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138. Under that prong, the question is whether defendants "knew of and disregarded an excessive risk to [a plaintiff's] health or safety and . . . [were] aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference." *Caiozzo*, 581 F.3d at 72 (alterations and internal quotation marks omitted). In other words, "[i]n medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with

28

deliberate indifference to inmate health." *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (internal quotation marks omitted). "Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (internal quotation marks omitted). In contrast, mere negligence is not enough to state a claim for deliberate indifference. *See Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013); *Vail v. City of N.Y.*, 68 F. Supp. 3d 412, 424 (S.D.N.Y. 2014). Moreover, "mere disagreement over the proper treatment does not create a constitutional claim," and accordingly, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998); *see also Banks v. Annucci*, 48 F. Supp. 3d 394, 407–08 (N.D.N.Y. 2014) (same).

Here, liberally construing Plaintiff's allegations, her claim can be taken to allege either delayed or denied medical attention. A review of the timeline reveals why this is so:

- Plaintiff arrived at Fishkill in the pre-dawn hours of May 8, 2011.[8] She was allegedly assaulted upon arrival.[9]

- At 3:45 a.m. on May 8, 2011, Defendants maintain, Peterson examined Plaintiff.[10] According to Plaintiff, this either never happened, or it happened when she was unconscious.[11]

---

[8] (*See* Defs.' 56.1 ¶ 4 (citing Pl. Dep. Tr. 16–17).)

[9] (*See* Defs.' 56.1 ¶ 6 (citing Am. Compl. 7–8).)

[10] (*See* Defs.' 56.1 ¶¶ 9, 11 (citing, inter alia, Peterson Decl. ¶ 10).)

[11] (*Compare* Pl.'s Dep. Tr. 102–03 ("My testimony, factual testimony, is no. Nurse Paterson [sic] never treated me . . . . Absolutely nothing."), *with* (*id.* 100–01 ("It is funny that, you know, [Peterson] put down scrapes and stuff, but I don't remember her examining me at all. Maybe she came in the cell when I was knocked out. I don't know. Me coherently, examining me, absolutely not. I remember seeing her while she was doing her rounds, and she ignored me.").)

- Several hours later, between 7:20 a.m. to 7:30 a.m., according to the special watch log, Plaintiff was speaking with Schneider, to whom Plaintiff said that she had been raped while at Arthur Kill.[12]

- Shortly thereafter, at approximately 7:45 a.m., Peterson observed Plaintiff being interviewed by OMH nursing staff, and did not find her to be in any distress.[13]

- Later on May 8, 2011, an OMH nurse prepared an RCTP nursing assessment, which reflected that Plaintiff claimed to have been raped at Arthur Kill, and felt scared and distraught, but that the only pain she experienced in the past two months was on her left ankle.[14]

- At approximately 11:10 a.m. on May 8, 2011, Plaintiff reported to Housman, among other things, that she hit her forehead on a railing after being dragged from a van when arriving at Fishkill, although Housman reported no marks on Plaintiff's forehead, and did not note any complaints about head pain or signs of head trauma, although Housman noted red marks on Plaintiff's wrist, and that Plaintiff complained of prior rectal bleeding.[15]

- On the morning of May 10, 2011, Marks observed Plaintiff and concluded that she complained only of constipation.[16]

- On May 11, 2011, at 9:30 a.m., Simons reported that Plaintiff had no complaints.[17]

---

[12] (Defs.' 56.1 ¶ 13 (citing Schulman Decl. Ex. D (special watch log) 2–3, 23; Schulman Decl. Ex. G (note from Schneider to Fredericks)).)

[13] (Defs.' 56.1 ¶ 14 (citing Schulman Decl. Ex. F (medical records) 69).)

[14] (Defs.' 56.1 ¶ 15 (citing Schulman Decl. Ex. H (OMH records) 33–34).)

[15] (Defs.' 56.1 ¶ 17 (citing Peterson Decl. ¶ 17; Schulman Decl. Ex. D (special watch log); Schulman Decl. Ex. F (medical records) 72; Schulman Decl. Ex. J (injury report)).)

[16] (Defs.' 56.1 ¶ 25 (citing, inter alia, Peterson Decl. ¶ 23; Schulman Decl. Ex. F (medical records) 68); *see also* Peterson Decl. ¶ 23.)

[17] (Defs.' 56.1 ¶ 25 (citing, inter alia, Peterson Decl. ¶ 24; Schulman Decl. Ex. F (medical records) 68).)

- On May 12, 2011, at 9:00 p.m., Spaight noted no complaints other than a history of chronic constipation.[18]

Accepting as true Plaintiff's assertion that Peterson never treated her, this forces one of two conclusions—either (1) that her care was delayed from 3:45 a.m.—that is, the time when, according to Defendants, Peterson examined Plaintiff—until approximately 7:20 a.m., when Plaintiff was next seen, or (2) that Plaintiff's care was not simply delayed but denied entirely, because the pain for which she sought Peterson's assistance had disappeared by the time of subsequent check-ins with the nurses.  In either case, Plaintiff cannot establish the objective prong, and, so, her Eighth Amendment claim fails.

Starting with the second of these possibilities, if Plaintiff's claim is that she was denied entirely of medical care for her injuries, then the conclusion is inescapable that they were not objectively sufficiently serious.  In considering whether a medical condition is sufficiently serious, the Second Circuit has "presented [a] non-exhaustive list of factors to consider when evaluating an inmate's medical condition," comprising "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain."  *Morales v. Fischer*, 46 F. Supp. 3d 239, 247 (W.D.N.Y. 2014) (internal quotation marks omitted) (quoting *Brock*, 315 F.3d at 162); *see also Salahuddin*, 467 F.3d at 280 (noting same considerations); *Davis*, 2016 WL 796847, at *4 (same).  Here, Plaintiff has alleged that she had (1) scrapes on her legs, back, elbow, and arm, and (2) a "pounding" headache.  (*See* Defs.' 56.1 ¶ 7 (citing Pl.'s Dep. Tr. 125).)  Numerous

---

[18] (Defs.' 56.1 ¶ 27 (citing Peterson Decl. ¶ 27; Schulman Decl. Ex. D (special watch log) 28; Schulman Decl. Ex. F (medical records) 66, 166–66A); *see also* Schulman Decl. Ex. F (medical records) 66.)

decisions by courts in the Second Circuit have held that scrapes are not sufficiently serious to implicate the Eighth Amendment. *See, e.g.*, *Lewis v. Cavanaugh*, No. 10-CV-112, 2015 WL 540593, at *8 (D. Conn. Feb. 10, 2015) ("Because the records of [the] plaintiff's examination at [the] [h]ospital following his arrest reveal that [the] plaintiff suffered only bruising and abrasions to the skin on his face, [the] plaintiff cannot show that he had a serious medical need and therefore cannot satisfy the objective prong of his deliberate indifference claim."); *Ruffino v. Gomez*, No. 05-CV-1209, 2006 WL 3248570, at *7–8 (D. Conn. Nov. 8, 2006) (finding no "material issue of fact that [the plaintiff] suffered from a serious medical need" based on scratches, scrapes, and bruises); *Montavon v. Town of Southington*, No. 95-CV-1141, 1997 WL 835053, at *4 (D. Conn. Sept. 29, 1997) ("Since there is no indication in the record that [the] plaintiff's bleeding was profuse or that he was experiencing any other conditions, his cuts and scrapes, by themselves, do not constitute serious medical needs.").  Similarly, not all headaches—even very bad ones—are serious enough to give rise to an Eighth Amendment violation.  *See Garcia v. Furnia*, No. 12-CV-924, 2014 WL 4685104, at *4 (N.D.N.Y. Sept. 19, 2014) (finding no sufficiently serious medical need where the plaintiff suffered from "(1) body soreness; (2) a black eye; (3) scrapes and minor contusions; (4) a headache; (5) a loose tooth; (6) a 'wobbly' knee; and (7) blurriness in one eye"); *Watts v. N.Y.C. Police Dep't*, 100 F. Supp. 3d 314, 328 (S.D.N.Y. 2015) ("Courts in this district have held that terrible and extreme headaches and swelling do not satisfy the objective component of the deliberate indifference inquiry." (alterations and internal quotation marks omitted)); *Sledge v. Bernstein*, No. 11-CV-7450, 2012 WL 4761582, at *5 (S.D.N.Y. Aug. 2, 2012) (same); *Bradley v. Rell*, 703 F. Supp. 2d 109, 122 (N.D.N.Y. 2010) (finding the objective prong not established where the plaintiff suffered from a headache, blurry vision, swelling and bruising around the head, and an abrasion to his right lower

leg from a dog bite, and where the plaintiff suffered later from "extreme headaches" and

psychological problems); *Qader v. New York*, 396 F. Supp. 2d 466, 470 (S.D.N.Y. 2005)

(finding that the "plaintiff's dizziness and 'terrible headache' do not satisfy the objective

component"). *But cf. Sharma v. D'Silva*, No. 14-CV-6146, 2016 WL 319863, at *4 (S.D.N.Y.

Jan. 25, 2016) (finding upon motion to dismiss that the plaintiff stated a deliberate indifference

claim against a dentist who did not make an appointment for the plaintiff to see a specialist

despite knowing that the plaintiff's condition caused him "severe headaches").

Viewed together, it stands to reason that Plaintiff's injuries—wrongful though the

(alleged) events through which she sustained them may have been—were not sufficiently serious

to implicate the Eighth Amendment, in light of the fact that Plaintiff was repeatedly checked

upon by nurses not long after she claimed to have been ignored by Peterson.  This is particularly

significant in light of the fact that many courts in the Second Circuit have found no Eighth

Amendment violation where the plaintiff could have complained about the allegedly objectively

serious medical condition, but did not.  *See, e.g.*, *Sonberg v. Niagara Cty. Jail*, No. 08-CV-364,

2012 WL 5617539, at *8 (W.D.N.Y. Nov. 15, 2012) (finding objective prong not established

where the plaintiff claimed that the jail did not put him on the "detox protocol" as it should have

due to the plaintiff's opiate medication usage, noting that "[t]o the extent that th[is]

failure . . . may constitute deliberate indifference, a review of the plaintiff's deposition indicates

no complaints of symptoms of opiate withdrawal"); *Santiago v. Coniglio*, No. 07-CV-791, 2009

WL 3672062, at *3 (W.D.N.Y. Oct. 29, 2009) ("Although over one year elapsed between the

time [the defendant doctor] first examined [the] plaintiff on September 22, 2006 and the October

23, 2007 surgery, during this period there were various periods where [the] plaintiff made no

complaints of knee pain and by November 2006, [the] plaintiff was doing well enough to

discontinue physical therapy."); *Dawkins v. Whalen*, No. 04-CV-943, 2009 WL 222975, at *11 (N.D.N.Y. Jan. 28, 2009) (concluding that "[the] plaintiff's injury to the tip of his left ring finger was not a serious injury," where "[the] [p]laintiff did not complain about pain in his finger or ask for treatment for almost two weeks after the incident").  Additionally, concluding—as is appropriate—that Plaintiff's state at the times she saw the medical professionals after Peterson was not marked by "a condition of urgency, one that may produce death, degeneration, or extreme pain," *Johnson*, 412 F.3d at 403, the fact that her pain dissipated by 7:20 a.m. or so, (*see* Defs.' 56.1 ¶ 13 (citing, inter alia, Schulman Decl. Ex. D (special watch log) 2–3)), suggests that Plaintiff's injuries *at the time* Peterson allegedly denied her care were also not so serious as to trigger an Eighth Amendment violation, *see Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003) ("[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm."); *see also Richardson v. City of N.Y.*, No. 15-CV-543, 2015 WL 7752143, at *9 (S.D.N.Y. Nov. 18, 2015) (same).

In contrast, if Plaintiff's claim is construed as one for *delayed* medical care from when Peterson should have seen her until roughly 7:20 a.m., the seriousness of that delay—which is the proper focus, *see Salahuddin*, 467 F.3d at 280—does not rise to the level of an Eighth Amendment violation, *cf. Mitchell v. N.Y.C. Dep't of Corr.*, No. 10-CV-292, 2011 WL 503087, at *4 (S.D.N.Y. Feb. 14, 2011) (observing that "[c]ourts in th[e] [Second] Circuit have repeatedly held that pain experienced for even longer than two to three hours does not rise to the level of an Eighth Amendment violation" and collecting cases).  Indeed, Plaintiff provides no basis to conclude that that several-hour delay needlessly prolonged her injuries, or otherwise made her injuries worse, and, consequently, she has no Eighth Amendment claim for delayed

medical treatment. *See Martinez v. Aycock-West*, No. 12-CV-4574, 2016 WL 407294, at *5 (S.D.N.Y. Feb. 1, 2016) (finding upon motion to dismiss the objective standard was unmet despite the plaintiff's "alleg[ations] that [the] [d]efendant did not provide medical care," where the plaintiff received medical care at most six hours later and where the plaintiff did not allege that "the several-hour delay needlessly prolonged or exacerbated his injuries in any way" (internal quotation marks omitted)); *Jones v. Avanzato*, No. 14-CV-2044, 2016 WL 183565, at *5 (S.D.N.Y. Jan. 13, 2016) ("[A] delay in treatment does not necessarily invoke the Eighth Amendment.  The Second Circuit has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment[,] ignored a life-threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." (internal quotation marks omitted)); *Robinson v. City of N.Y.*, No. 10-CV-3295, 2010 WL 4961797, at *1–2 (E.D.N.Y. Nov. 30, 2010) (finding a nurse's limited treatment of the plaintiff involved in an accident did not actually deprive the plaintiff of adequate medical care, when the plaintiff received a full examination in the morning); *cf. Cain v. Jackson*, No. 05-CV-3914, 2007 WL 2193997, at *7 (S.D.N.Y. July 27, 2007) (noting in context of subjective prong that the "[p]laintiff's allegations of delays of several hours in her access to medical care do not amount to a constitutional violation" (citation omitted)).

Therefore, Plaintiff has not established a genuine dispute of material fact surrounding whether there was a sufficiently serious deprivation, *Spavone*, 719 F.3d at 138, to amount to deliberate indifference, and, as a result, summary judgment for Peterson on Plaintiff's Eighth Amendment claim is warranted.[19]  Because the Court dismisses Plaintiff's claim against

---

[19] Partly as an act of special solicitude to Plaintiff, the Court has not quibbled with Plaintiff's proposition that Peterson "ignored" Plaintiff, (*see* Pl.'s Dep. Tr. 101), although it merits observation that Plaintiff, in her Amended Complaint, claims that she "showed many

Peterson, there is no need to consider whether she may also be entitled to qualified immunity.

*See, e.g.*, *Posr v. City of N.Y.*, No. 10-CV-2551, 2013 WL 2419142, at \*10 n.8 (S.D.N.Y. June 4,

2013) ("Because [the defendant] did not violate [the] [p]laintiff's [constitutional] rights, there is

no need to consider if [the defendant] is entitled to qualified immunity."), *aff'd sub nom. Posr v.*

*Ueberbacher*, 569 F. App'x 32 (2d Cir. 2014).

        2. PLRA

        The PLRA provides that "[n]o action shall be brought with respect to prison conditions

under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or

other correctional facility until such administrative remedies as are available are exhausted."  42

U.S.C. § 1997e(a).  The exhaustion requirement applies to all personal incidents while in prison,

*Porter v. Nussle*, 534 U.S. 516, 532 (2002) (holding exhaustion is required for "all inmate suits

about prison life, whether they involve general circumstances or particular episodes"); *see also*

*Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012) (same), and includes actions for monetary

damages despite the fact that monetary damages are not available as an administrative remedy,

---

abrasion[s] that were located on the [a]rm, [s]houlders, [u]pper [l]egs, [and] both [a]nkles to
[Peterson]," (Am. Compl. 9).  Reconciling these two assertions may compel the conclusion that,
when Plaintiff claims that Peterson ignored her, Plaintiff in fact means to describe the *quality* of
Peterson's care, rather than whether Peterson, as a factual matter, behaved as though Plaintiff
were not there.  If so, that would doom Plaintiff's Eighth Amendment claim because, while
failing to recognize the severity of an inmate's injuries might amount to medical malpractice,
*see, e.g.*, *Beaman v. Unger*, 838 F. Supp. 2d 108, 110 (W.D.N.Y. 2011) (finding that where,
"[a]ccording to [the] plaintiff's allegations, he did receive medical treatment for his injuries,"
"[t]he most that his allegations show . . . is that . . . two nurses and [a doctor] misdiagnosed his
injuries, and failed to recognize the severity of those injuries," which amounted not to an Eighth
Amendment violation, but "might conceivably show malpractice"), "[m]edical malpractice does
not become a constitutional violation merely because the victim is a prisoner," *Estelle v. Gamble*,
429 U.S. 97, 106 (1976).  This proposition is unchanged by Plaintiff's assertion that, in so doing,
Peterson functionally ignored Plaintiff, because "conclusory allegations . . . cannot by
themselves create a genuine issue of material fact where none would otherwise exist."  *Hicks v.*
*Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks omitted).

*Booth v. Churner*, 532 U.S. 731, 741 (2001) (holding exhaustion is required "regardless of the relief offered through administrative procedures").  Moreover, the PLRA mandates "'proper exhaustion'—that is, 'using all steps that the agency holds out, and doing so properly,' . . . [which] entails . . . 'completing the administrative review process in accordance with the applicable procedural rules.'"  *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88, 90 (2006)).  Finally, the PLRA applies even to a plaintiff who is not currently incarcerated, provided that he had been incarcerated when he brought his initial suit.  *See Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2004) ("Because [the plaintiff] was a confined prisoner at the time he filed his lawsuits, [§] 1997e(a) is applicable."); *see also Clemons v. Futch*, No. 07-CV-7200, 2015 WL 8526683, at *1 (S.D.N.Y. Oct. 16, 2015) (same).  Indeed, the PLRA demands "strict compliance with the grievance procedures . . . , or else dismissal must follow inexorably."  *McCoy v. Goord*, 255 F. Supp. 2d 233, 246 (S.D.N.Y. 2003) (internal quotation marks omitted).

Nevertheless, "[b]ecause failure to exhaust is an affirmative defense, [D]efendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute."  *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (alterations, citations, and internal quotation marks omitted); *see also Powell v. Schriro*, No. 14-CV-6207, 2015 WL 7017516, at *6 (S.D.N.Y. Nov. 12, 2015) (same).

Therefore, the Court must answer the following questions:  (1) did Plaintiff exhaust her administrative remedies, and (2) if not, does some exception permit her claim to proceed all the same?

### a.  Did Plaintiff Exhaust?

As a general matter, New York has a three-step grievance process for inmates in its correctional facilities.  (*See* Defs.' Mem. 18–19 (citing 7 N.Y.C.R.R. § 701 et seq.).)  *See also Abdallah v. Ragner*, No. 12-CV-8840, 2013 WL 7118083, at *2 (S.D.N.Y. Nov. 22, 2013) (noting that "[DOCCS] provides an administrative remedy for many prisoners' claims," which is "a grievance system available to prisoners in custody at state prisons, such as Fishkill."  (citing 7 N.Y.C.R.R. § 701.1(c))).  Under the framework used in typical cases, an inmate must first file a complaint at the facility where the inmate is housed within 21 calendar days of an alleged occurrence.  7 N.Y.C.R.R. § 701.5(a)(1).  Despite this time limit, a grievant may request an exception, *see id.*, based on "mitigating circumstances," *id.* § 701.6(g)(1)(i)(a), but no exception will be granted if the request was made more than 45 days after the alleged occurrence, *id.*  Upon receipt, the grievance clerk consecutively numbers and logs each grievance.  *Id.* § 701.5(a)(2).  Additionally, once filed, the representatives of the Inmate Grievance Resolution Committee ("IGRC") have up to 16 calendar days to resolve it informally.  *Id.* § 701.5(b)(1).  If the matter is not satisfactorily resolved, the IGRC conducts a hearing to either answer the grievance or make a recommendation to the superintendent, *id.* § 701.5(b)(2)(i), which is scheduled within 16 days after receipt of the grievance, *id.* § 701.5(b)(2)(ii).

The second step in the tripartite framework is for the grievant or any direct party to appeal the IGRC's decision to the prison superintendent within seven calendar days after receipt of the written response, although the appealing party can seek an exception to the time limit, *id.* § 701.5(c)(1), again based on mitigating circumstances, *id.* § 701.6(g)(1)(i)(b), provided that the request was not made more than 45 days after the date of the decision, unless the late appeal asserts a failure to implement the IGRC's decision, *see id.*

38

The third and final step is to appeal the superintendent's decision to the CORC, which he or she must do within seven days of the superintendent's written response to the grievance. *Id.* § 701.5(d)(1)(i). Here, too, an inmate may request an exception to the time limit, *id.*, if based on mitigating circumstances and if made within 45 days of the date of the decision, unless, again, the late appeal asserts a failure to implement the decision, *id.* § 701.6(g)(1)(i)(b).

The framework operates slightly differently for harassment and discrimination claims, *see id.* §§ 701.8, 701.9, which Defendants maintain would include Plaintiff's allegations, (*see* Defs.' Mem. 19). For harassment charges, although an inmate must still follow the procedures identified above and contained in § 701.5(a), *see* § 701.8(a), the regulations also provide that "[a]n inmate who feels that he/she has been the victim of harassment should report such occurrences to the immediate supervisor of that employee," although "this is not a prerequisite for filing a grievance with the IGP," *id.* Additionally, the framework also provides that "[a]ll documents submitted with [a grievance alleging harassment] must be forwarded to the superintendent by close of business that day," *id.* § 701.8(b), and that the superintendent personally or through a designee "shall promptly determine whether the grievance, if true, would represent a bona fide case of harassment as defined in section 701.2," *id.* § 701.8(c), which defines a "[h]arassment grievance[]" as "those grievances that allege employee misconduct meant to annoy, intimidate or harm an inmate," *id.* § 701.2(e). If it is not, the grievance is returned to the IGRC for normal processing. *Id.* § 701.8(c). If it is a bona fide harassment issue, however, the superintendent must then (1) initiate an in-house investigation into the allegations by higher-ranking supervisory personnel, (2) request an investigation by the inspector general's office, or (3) request an investigation by the New York State Police Bureau of Criminal Investigation, if the superintendent determines that criminal activity may be involved. *Id.*

§ 701.8(d).  The superintendent then must render a decision within 25 calendar days of receipt of the grievance, *id.* § 701.8(f), and, if she does not, the grievant may appeal to the CORC, *id.* § 701.8(g).  When a grievant wishes to appeal the superintendent's response to the CORC, the grievant must do so within seven days of the receipt of that response.  *Id.* § 701.8(h).

Similarly, in the case of discrimination claims, the grievance must be forwarded to, among others, the superintendent within 24 hours, *id.* § 701.9(c), who then also has 25 days from the receipt of a grievance to render a decision, *id.* § 701.9(f), and the inmate has seven calendar days from receipt of the response to appeal, *id.* § 701.9(g).  Regardless of whether a given grievance is governed by § 701.8's procedure for harassment claims, § 701.9's procedure for discrimination claims, or the more general framework found in § 701.5, the grievant must appeal to the CORC before his claims are fully exhausted.  *See id.* §§ 701.5(d), 701.8(g)–(h), 701.9(g)–(i); *see also, e.g.*, *Medina v. Napoli*, No. 07-CV-497, 2015 WL 5638101, at *5 (W.D.N.Y. Sept. 24, 2015) ("[T]he courts have not hesitated to grant summary judgment dismissing inmates' § 1983 complaints under the PLRA's mandatory exhaustion requirement where the evidence contains no record of appeal to the CORC."); *Richardson v. N.Y. State Dep't of Corr.*, No. 13-CV-6189, 2014 WL 3928785, at *6 (S.D.N.Y. Aug. 11, 2014), ("While [one of the plaintiffs] filed grievances with [the correctional facility's] IGP concerning [the incidents at issue], [the] [p]laintiffs' submissions do not show that either of these grievances were appealed to the CORC in accordance with §§ 701 .5 and 701.8."), *aff'd sub nom. Richardson v. N.Y. State Dep't of Corr. & Cmty. Supervision Employees*, —F. App'x—, 2016 WL 690981 (2d Cir. Feb. 22, 2016).

Here, Defendants have put forward evidence sufficient to conclude that Plaintiff did not exhaust her administrative remedies.  Indeed, the evidence suggests that Plaintiff filed seven grievances after the alleged assault at Fishkill, (*see* Schulman Decl. Ex. P (grievance documents)

1), and that Plaintiff appealed three of these grievances all the way to the CORC, (*see* Hale Decl. ¶ 5 & Hale Decl. Ex. A).[20]   Therefore, because "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court," *Jones v. Bock*, 549 U.S. 199, 211 (2007), something must excuse Plaintiff's noncompliance with the DOCCS's grievance process in order for her to avoid summary judgment.

### b.  Does an Exception Apply?

The Second Circuit has, in fact, recognized certain exceptions to the exhaustion requirement to the PLRA.  *See Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004). Specifically, those exceptions forgive an inmate's nonexhaustion when:  "(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense . . . or acted in such a[] way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure"

---

[20] Although Plaintiff does not press the point, no case could be made that Plaintiff, in effect, exhausted her remedies inasmuch as prison officials were aware of her grievance.  To the contrary, merely "[a]lerting . . . prison officials as to the nature of the wrong for which redress is sought does not constitute proper exhaustion."  *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007) (alteration, citations, and internal quotation marks omitted); *see also Perez v. City of N.Y.*, No. 14-CV-7502, 2015 WL 3652511, at *4 (S.D.N.Y. June 11, 2015) (explaining that the "[p]laintiff's allegation that he advised others of his grievance does not excuse his failure to exhaust the administrative process specified in the IGRP").  "Regardless of whether . . . informal complaints put the prison officials on notice of his grievance 'in a substantive sense,' . . . to satisfy the PLRA, a prisoner must also procedurally exhaust his [or her] available remedies." *Macias*, 495 F.3d at 43 (internal quotation marks omitted) (quoting *Johnson v. Testman*, 380 F.3d 691, 697–98 (2d Cir. 2004)).  Substantive notice alone is insufficient because "[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance," and "[t]he prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules."  *Woodford*, 548 U.S. at 94.

Similarly, no case could be made that Plaintiff did not have remedies available to her by virtue of her stay in the SHU or because she was transferred between facilities.  The applicable regulations contain special provisions for both such situations.  *See* 7 N.Y.C.R.R. §§ 701.6(h), 701.7.

to exhaust her remedies.  *Ruggiero v. Cty. Of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (citing

*Hemphill*, 380 F.3d at 686); *Powell*, 2015 WL 7017516, at *6 ("After the defendant satisfies this

burden [of invoking the affirmative defense of failure to exhaust under the PLRA], the plaintiff

may attempt to overcome the PLRA's exhaustion requirement by demonstrating one of the

*Hemphill* exceptions.").  However, when deciding whether one of these exceptions apply, courts

are to remember that "the resolution of the exhaustion issue does not necessarily fit exactly into

any of these three categories, and a particular fact pattern may implicate one or a combination of

these factors."  *Pagan v. Brown*, No. 08-CV-724, 2009 WL 2581572, at *5 (N.D.N.Y. Aug. 19,

2009) (citing *Giano v. Goord*, 380 F.3d 670, 677 n.6 (2d Cir. 2004)).

   With regard to the first inquiry, "[t]he test for deciding whether the ordinary grievance

procedures were available must be an objective one:  that is, would a similarly situated individual

of ordinary firmness have deemed them available."  *Hemphill*, 380 F.3d at 688 (internal

quotation marks omitted); *see also Ribot v. City of N.Y.*, No. 14-CV-3917, 2016 WL 462514, at

*2 (S.D.N.Y. Jan. 28, 2016) (same); *Mateo v. Bristow*, No. 12-CV-5052, 2014 WL 4631569, at

*9 (S.D.N.Y. Sept. 17, 2014) (same), *adopted by* 2015 WL 925933 (S.D.N.Y. Mar. 4, 2015).

"[A]dministrative remedies may . . . be deemed unavailable if the plaintiff can demonstrate that

other factors—for example, threats from correction officers—rendered a nominally available

procedure unavailable as a matter of fact."  *Hubbs*, 788 F.3d at 59 (citing *Hemphill*, 380 F.3d at

687–88).  This may be so even if the inmate seeks relief from authorities through means other

than a grievance.  *See Hemphill*, 380 F.3d at 688 (rejecting the argument that the fact that "[the

plaintiff] sent a letter to [the] [s]uperintendent . . . and filed this suit means that he was not—as a

matter of law—sufficiently frightened as to render normal grievance procedures unavailable");

*see also Heyliger v. Gebler*, No. 06-CV-6220, 2014 WL 4923140, at *2 (W.D.N.Y. Sept. 30,

2014) ("[T]hreats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." (some internal quotation marks omitted)) *aff'd*, 624 F. App'x 780 (2d Cir. 2015).  For the reasons to be explained, the Court concludes that there is at least a factual dispute about whether administrative remedies were not available to Plaintiff.[21]

_____

[21] Before explaining why, the Court feels obligated to note that it is not entirely clear that *Hemphill* exceptions remain good law after the Supreme Court's decision in *Woodford v. Ngo*, 548 U.S. 81 (2006).  In *Woodford*, the Supreme Court held that the PLRA's exhaustion requirement mandates not merely "exhaustion simpliciter" but rather "proper exhaustion," which "demands compliance with an agency's deadlines and other critical procedural rules."  *See Woodford*, 548 U.S. at 83, 88, 91.  Although Second Circuit law confirms that *Woodford* may indeed have imperiled the *Hemphill* factors' vitality, it has not yet explicitly determined whether these three exceptions remain good law.  *See Amador*, 655 F.3d at 102 ("Subsequent decisions have questioned the continued viability of this framework following the Supreme Court's decision in *Woodford* . . . ."); *see also, e.g.*, *Heyliger*, 624 F. App'x at 783 ("We have previously noted that the Supreme Court's decision in *Woodford v. Ngo* . . .  may call certain of these exceptions into question . . . . [H]owever, we need not decide that issue here because [the plaintiff] has failed to satisfy the PLRA even under our pre-*Woodford* precedents."); *Ruggiero*, 467 F.3d at 176 ("We need not determine what effect *Woodford* has on our case law in this area, however, because [the plaintiff] could not have prevailed even under our pre-*Woodford* case law."); *Rambert v. Mulkins*, No. 11-CV-7421, 2014 WL 2440747, at *11 (S.D.N.Y. May 30, 2014) (noting that "the Second Circuit has left unresolved the continuing vitality of the Hemphill exceptions in light of the Supreme Court's ruling in *Woodford v. Ngo*," but concluding that "*Hemphill* remains good law").

Nevertheless, there is ample authority that makes clear that *Hemphill*'s availability analysis remains good law.  *See Hubbs*, 788 F.3d at 59 (noting that, even if the defendants establish the existence of an applicable grievance process, "administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors—for example, threats from correction officers—rendered a nominally available procedure unavailable as a matter of fact" (citing *Hemphill*, 380 F.3d at 687–88)); *Gomez v. Chill*, No. 11-CV-6844, 2015 WL 1853110, at *5 n.2 (S.D.N.Y. Apr. 17, 2015) ("The Second Circuit has . . . explicitly rejected the argument that *Woodford* abrogated the 'exemption to the PLRA for inmates to whom the normal grievance system was unavailable.'" (quoting *Johnston v. Maha*, 460 F. App'x 11, 15 n.6 (2d Cir. 2012)), *adopted by* 2015 WL 3862709 (S.D.N.Y. June 9, 2015); *Spurgeon v. Wettenstein*, No. 13-CV-8117, 2015 WL 1408874, at *3 (S.D.N.Y. Mar. 26, 2015) ("[T]he Second Circuit has never squarely decided in the continuing vitality of *Hemphill*'s three exceptions, and has continued to apply them in analyses even since the decision in *Woodford*."); *Houston v. Schriro*, No. 11-CV-7374, 2014 WL 6694468, at *4 (S.D.N.Y. Nov. 26, 2014) ("[A]

Conceptually, Plaintiff might argue administrative remedies were unavailable to Plaintiff for two reasons: First, she could argue that they were unavailable because, despite putative efforts to do so, she did not successfully file a grievance at Fishkill; and, second, the case could be made that remedies were not available because the conduct of prison officials at Five Points prevented her from following up on her missing grievance from Fishkill.  The Court considers each in turn.

### i.  The Events at Fishkill

With regard to the former, "[d]espite the plain language of 7 N.Y.C.R.R. § 701.6(g), there appears to be some confusion regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number." *Wallace v. Fisher*, No. 13-CV-1208, 2015 WL 9275001, at *2 (N.D.N.Y. Dec. 18, 2015).  On the one hand, there are some cases indicating that a prospective plaintiff need not work through the full three-part framework where she submits a grievance and no action is taken in response.  *See, e.g.*, *Rossi v. Fischer*, No. 13-CV-3167, 2015 WL 769551, at *6 (S.D.N.Y. Feb. 24, 2015) ("Because prison officials failed to respond to [the] plaintiff's grievance within the 30[-]day time limit set by regulation, administrative remedies were not available to the plaintiff, and dismissal

---

[p]laintiff can successfully counter a defendant's failure to exhaust contention if administrative remedies were not, in fact, available."); *see also Vega v. Rell*, 611 F. App'x 22, 26 (2d Cir. 2015) ("While exhaustion is mandatory, failure to exhaust may be excused when administrative remedies are not available to the prisoner or when the prisoner has a reasonable misunderstanding of the grievance procedures." (internal quotation marks omitted)); *cf. Messa v. Goord*, 652 F.3d 305, 309 (2d Cir. 2011) (per curiam) (noting that "[a]n inmate's failure to comply with this requirement may be excused where:  (1) administrative remedies were not in fact available to the prisoner, (2) defendants' own actions inhibited exhaustion, or (3) special circumstances justify non-exhaustion." (alterations and internal quotation marks omitted) (citing *Hemphill*, 380 F.3d at 686)).  Because the Court concludes that administrative remedies were, in fact, not available to Plaintiff, there is no reason to consider whether her failure to exhaust may be excused under the doctrines of estoppel or special circumstances.

for failure to exhaust is not appropriate."); *Dixon v. Thom*, No. 11-CV-5901, 2013 WL 264602, at *3 (S.D.N.Y. Jan. 11, 2013) ("[A] correctional facilit[y's] failure to respond can constitute an exception to the exhaustion requirement."); *Thomas v. Connolly*, No. 10-CV-2401, 2012 WL 3776698, at *10 n.10 (S.D.N.Y. Apr. 10, 2012) ("It bears mention that in recognizing in general terms the exception to exhaustion for unavailable remedies, the Second Circuit in *Hemphill* noted in passing the possibility that if no response at all was received from the prison authorities, the unavailability exception might apply, but it also seemed to suggest that this might occur only if the grievance authorities did not record the grievance as required by DOCCS regulations. Subsequent decisions have indicated that this distinction may be the pertinent one in these circumstances . . . ." (citation omitted) (citing *Hemphill*, 380 F.3d at 686 n.6)), *adopted by* 2012 WL 3758457 (S.D.N.Y. Aug. 30, 2012); *Randolph v. City of N.Y. Dep't of Corr.*, No. 05-CV-8820, 2007 WL 2660282, at *9 n.10 (S.D.N.Y. Sept. 7, 2007) ("Whether a lack of response from prison officials renders administrative remedies 'unavailable' may depend on such details as whether an inmate grievance was internally acknowledged, that is, recorded and assigned a grievance number."); *cf. Johnson v. Tedford*, 616 F. Supp. 2d 321, 326 (N.D.N.Y. 2007) (noting that "several Southern District cases have recognized that when a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review," and declining to dismiss claim for failure to exhaust where "[the plaintiff's] allegations set out exactly such a scenario" (emphasis in original)).

On the other hand, a number of courts reject this assertion. *See, e.g.*, *Wallace*, 2015 WL 9275001, at *2 ("After carefully reviewing the case law, the [c]ourt finds that the weight of authority (and the better-reasoned authority) answers th[e] question [of whether the IGRC's

nonresponse to a grievance must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number] in the affirmative."); *Smith v. City of N.Y.*, No. 12-CV-3303, 2013 WL 5434144, at *20 (S.D.N.Y. Sept. 26, 2013) ("[One of the plaintiffs] also asserts that the Grievance Office lost his grievance form, suggesting that the grievance program was so ineffective as to render it 'unavailable' to him . . . . [The plaintiff's] assertion alone is not enough to render the entire program 'unavailable.'"); *Rosado v. Fessetto*, No. 09-CV-67, 2010 WL 3808813, at *7 (N.D.N.Y. Aug. 4, 2010) ("Courts have consistently held . . . that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement."), *adopted by* 2010 WL 3809991 (N.D.N.Y. Sept. 21, 2010); *Veloz v. New York*, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (concluding that the administrative remedies were available to the plaintiff despite his claim that his "allegation that [certain] grievances," which there was no evidence that the plaintiff filed, "were misplaced or destroyed by correctional officers," reasoning that such an assertion "ultimately does not relieve him of the requirement to appeal these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"), *aff'd*, 178 F. App'x 39 (2d Cir. 2006).

The Court thinks the latter camp makes the stronger case. This is so for several reasons. First, such a conclusion accords well with at least part of the rationale of *Woodford*. In that case, the Supreme Court rebuffed the Ninth Circuit's conclusion that an inmate "had exhausted administrative remedies simply because no such remedies remained available to him," insisting on proper exhaustion, rather than exhaustion simpliciter, in part reasoning that "exhaustion promotes efficiency," inasmuch as "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." *Woodford*, 548 U.S. at 87. That is a particularly compelling consideration in the case of DOCCS's regulations

in light of the confluence of three observations:  (1) under the regulations, an inmate has 21 days

from the occurrence at issue to file a grievance, (7 N.Y.C.R.R. § 701.5(a)(1)), (2) the IGRC has

16 days from when the grievance is filed to try to informally resolve the matter through its

representatives, (*id.* § 701.5(b)(1)), and (3) an inmate may request an exception to the time limit

for filing a grievance based on mitigating circumstances until 45 days after the alleged

occurrence, (*id.* § 701.6(g)(1)(i)(a)).  In other words, if an inmate waits until the last possible day

to file a grievance (21 days), and then waits the entire time during which the IGRC's

representatives are permitted to try to resolve the matter (an additional 16 days), the inmate still

has over a week in which he could confirm that his hearing is being scheduled, and, if he learns it

is not, seek an exception to the now-elapsed 21-day time limit to file a new grievance.  Putting

the onus on him to do so is certainly "quick[er] and [more] economical[] . . . than . . . litigation in

federal court."  *Woodford*, 548 U.S. at 87.

Second, many of the cases that treat the prison officials' silence as excusing compliance

with the exhaustion system do so by citing footnote six from *Hemphill*.  *See, e.g.*, *Rossi*, 2015

WL 769551, at *4 (noting that "[w]hile the Second Circuit has not directly addressed this issue,

it has treated . . . favorably" "[a] number of federal circuit courts [that] have held that a failure to

respond to a grievance within the time limit prescribed by the prison grievance process renders

an administrative remedy unavailable for purposes of exhaustion." (citing *Hemphill,* 380 F.3d at

686 n.6 )); *Thomas*, 2012 WL 3776698, at *10 n.10 ("[T]he Second Circuit in *Hemphill* noted in

passing the possibility that if no response at all was received from the prison authorities, the

unavailability exception might apply . . . ." (citing *Hemphill,* 380 F.3d at 686 n.6)).  In that

footnote, the Second Circuit wrote:

> We note, however, that if [the plaintiff] wrote in a timely fashion to the
> Superintendent pursuant to a possibly valid interpretation of DOC[C]S grievance

> procedures, there might be a question as to the availability of remedies, since [the plaintiff] received no response to his letter, and there is no indication in the record that his grievance was ever recorded, as required by DOC[C]S regulations.  We express no view on whether [the plaintiff's] allegations can support such a theory.

*Hemphill,* 380 F.3d at 686 n.6 (citations omitted).  This footnote does not compel the conclusion that an unanswered grievance demonstrates the unavailability of administrative remedies, but rather indicates that "there might be a question" surrounding the issue.  *See id.*[22]  Additionally, the footnote cites to, among three other cases, *Underwood v. Wilson*, which "h[e]ld that available administrative remedies are exhausted when the time limits for the prison's response set forth in the prison Grievance Procedures have expired," 151 F.3d 292, 295 (5th Cir. 1998), and which the Fifth Circuit later concluded had been "has been tacitly overruled and is no longer good law to the extent it permits prisoner lawsuits challenging prison conditions to proceed in the absence of pre-filing administrative exhaustion," in light of the Supreme Court's decisions in *Woodford* and *Jones*, after which "there can be no doubt that pre-filing exhaustion of prison grievance processes is mandatory," *Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012).  Therefore, the Court does not think that the Second Circuit's pre-*Woodford* commentary as to the possibility of the existence of a question, supported by partially overruled case law, is enough to conclude that an inmate has discharged her duties under the PLRA where she fires off a grievance, hears nothing, and then sues.

---

[22] Indeed, it is possible to read the footnote in precisely the opposite manner.  *See Rivera v. Anna M. Kross Ctr.*, No. 10-CV-8696, 2012 WL 383941, at *4 (S.D.N.Y. Feb. 7, 2012) ("[I]t is notable that a number of federal circuit courts have held that when a grievant files a complaint and receives no response from prison authorities within the time limits established by the grievance procedures, the remedies associated with those procedures may be considered 'unavailable' for purposes of exhaustion.  The Second Circuit has expressly declined those decisions' holding as the law of this Circuit.  *See Hemphill,* 380 F.3d at 686 n. 6." (some citations and some internal quotation marks omitted)).

Third and finally, under § 701.8's "expedited" procedures, *see, e.g.*, *Garcia v. Heath*, No. 12-CV-4695, 2013 WL 3237445, at *5 (S.D.N.Y. June 25, 2013), a superintendent's failure to respond within 25 days of receiving the grievance may be appealed to the CORC, *see* 7 N.Y.C.R.R. § 701.8(g).  Such an observation compels the conclusion that, similarly, under the "normal processing," *id.* § 701.8(c), procedure described in § 701.5, an inmate must also appeal the non-response to his grievance, and that a failure to do so means that he has not exhausted his administrative remedies, *see Ruggiero*, 467 F.3d at 176 ("PLRA exhaustion . . . 'demands compliance with an agency's deadlines and other critical procedural rules.'" (quoting *Woodford*, 548 U.S. at 90)).  To conclude that a grievance that goes unacknowledged must be appealed under the "expedited" framework, but not under the normal protocol because, in the latter case, administrative remedies were "unavailable" feels, at best, an academic distinction, and one which does an end-run around *Woodford*'s mandate that "prisons [be provided] with a fair opportunity to correct their own errors." *Woodford*, 548 U.S. at 94.  Therefore, the Court concludes that an inmate's bare assertion that she indeed filed a grievance, but that prison officials lost or discarded it, is insufficient to relieve her of the obligation to continue to exhaust through an appeal. *See Dabney v. Pegano*, No. 10-CV-1109, 2013 WL 5464776, at *8 (N.D.N.Y. Sept. 30, 2013) ("[E]ven if the [c]ourt were to accept as true [the] [p]laintiff's claim that his grievance 'was thrown away' by [the correctional facility's] administration in an attempt to thwart him [by preventing proper filing of the grievance], [the correctional facility's] culpable conduct does not excuse [the] [p]laintiff's failure to appeal this grievance to the next level."), *aff'd*, 604 F. App'x 1 (2d Cir. 2015).

Likewise, no argument could be made that administrative remedies were not available to Plaintiff at Fishkill by virtue of her allegation that, "[w]hile at Fishkill . . . [,] [she] was ignored

by [c]orrectional [s]taff in asking for supplies and [g]rievance forms after [her] [t]ransfer[] from the [i]nfirmary into the SHU," and that she filed a grievance only because she "managed to borrow a pen and a paper from [her] neighbor[,] [and] wrote out [her] complaint," which she "place[d] . . . in the crack of the cell door."  (Am. Compl. 6.)  An unsuccessful request for grievances, without more, does not mean that administrative remedies were unavailable.  *See, e.g.*, *Silvagnoli v. Figueroa*, No. 12-CV-7761, 2014 WL 4160213, at *4 (S.D.N.Y. Aug. 19, 2014) (concluding that the plaintiff's assertion that he "requested a grievance form from [a] [s]ergeant . . . on multiple occasions, and that each time, [the] [s]ergeant . . . ignored his requests" was insufficient to conclude that remedies were unavailable (alterations and internal quotation marks omitted)); *Indelicato v. Suarez*, 207 F. Supp. 2d 216, 219 (S.D.N.Y. 2002) ("Denial of [grievance] forms . . . does not itself constitute a denial of remedies."); *cf. Ceparano v. Cty. of Suffolk*, No. 10-CV-2030, 2013 WL 6576817, at *5 (E.D.N.Y. Dec. 13, 2013) ("Given [the] plaintiff's failure to make reasonable attempts to file grievances at any time regarding the incidents involving [certain defendants], on an official form or otherwise, his allegation that official grievance forms were unavailable does not excuse his failure to exhaust administrative remedies.").  *But see Rodriguez v. Cty. of Suffolk*, No. 13-CV-2070, 2014 WL 3531897, at *7 (E.D.N.Y. June 30, 2014) ("A plaintiff's legitimate request for a grievance form should not be ignored.  Even if the correctional officer's failure to provide a grievance form was innocent, such a failure effectively renders administrative remedies unavailable." (citation omitted)), *adopted by* 2014 WL 3532529 (E.D.N.Y. July 14, 2014).  Therefore, no argument can be made that conduct at Fishkill, by itself, rendered administrative remedies unavailable.

ii.  The Events at Five Points

A different conclusion must be reached with respect to Plaintiff's allegations concerning her arrival at Five Points, however.  As noted, Plaintiff claims that, upon arrival, she was "assaulted by staff again," and that, "while this was taking place[,] one of the two Supervising Officers placed a knife on[]to Plaintiff['s] face and threaten Plaintiff [sic]."  (Am. Compl. 6.) Again, as noted, Plaintiff describes this incident under the heading "grievances filed," in her Amended Complaint.  (*Id.*)  Additionally, when asked whether Plaintiff discussed "this incident" with any Five Point inmates, Plaintiff responded that "[t]he officers were liv[i]d at Five Points.  I guess this is why they attacked me," and further said that the officers discussed the Fishkill incident "loudly."  (Pl.'s Dep. Tr. 121–22.)  Similarly, when Plaintiff was asked whether "any of [the Defendants in this case] sa[id] to [Plaintiff], in substance, you better not file a grievance or anything like that," Plaintiff, after asking for clarification, responded that "[t]hey only said [sic] while I was at Five Points, not Fishkill."  (*Id.* at 119.)  Thereafter, Plaintiff sent a letter to the Inspector General's Office on June 30, 2011, alluding to a "series of event[s]" that happened which she preferred to describe "in person."  (Schulman Decl. Ex. N (letter to inspector general), at unnumbered 2–3.)  Taken together, and construing Plaintiff's pleadings liberally, *see Hemphill*, 380 F.3d at 687, Plaintiff may well have been discouraged—through threats if not also a beating—from grieving the Fishkill incident.

However, that may be beside the point if Plaintiff had other avenues to pursue his Fishkill claim besides seeking administrative relief while at Five Points.  *See, e.g.*, *Wallace*, 2015 WL 9275001, at *4 (dismissing the complaint for failure to exhaust in accordance with the PLRA, where among other things, the court concluded that "even if [the] [p]laintiff's administrative remedies were somehow rendered unavailable at [the first correctional facility] between the date

51

of the alleged incident (September 13, 2013) and the date of his transfer to [a second correctional

facility] (October 17, 2013)," he still had until October 28 to request an extension of time to file

a grievance); *Chiarappa v. Meyers*, No. 09-CV-607, 2013 WL 6328478, at *2, *7 (W.D.N.Y.

Dec. 5, 2013) (concluding that the plaintiff was not deterred from exhausting his administrative

remedies where he waited two weeks after arriving at a new correctional facility to file an

untimely grievance and then an additional week to file a request for an exception to the time

limit, despite claim that, at his previous facility, he was "told by the SHU guards that he was on

the 'beat up' list for complaining about a corrections officer"); *Snyder v. Whittier*, No. 05-CV-

1284, 2009 WL 691940, at *10 (N.D.N.Y. Mar. 12, 2009) ("[The] [p]laintiff's contention that he

did not file a grievance at Washington [Correctional Facility] concerning the matter out of fear of

retribution is fatally undermined by the fact that while he was transferred out of Washington and

into Groveland [Correctional Facility] on July 15, 2005, it was not until more than one month

later, on August 24, 2005, that he first attempted to file a grievance regarding the matter."), *aff'd*,

428 F. App'x 89 (2d Cir. 2011).[23]

Here, however, Plaintiff's access to administrative remedies at Five Points was necessary

to salvage her apparently misplaced or destroyed Fishkill grievance.  A review of the timeline

reveals why this is so:  As noted, Plaintiff alleges she was transferred to Fishkill on May 7, 2011,

and assaulted upon arrival.  (*See* Defs.' 56.1 ¶¶ 3–7.)  Then, on May 17, 2011, Plaintiff was

transferred from Fishkill to Five Points, briefly stopping at Downstate Correctional Facility.  (*Id.*

---

[23] On appeal, the Second Circuit noted in *Snyder* that while "[t]he delay in filing an
official grievance is not helpful to [the plaintiff]," it would "not necessarily have negated a
finding that there was a triable question of fact regarding whether [the plaintiff] really did avoid
filing a formal grievance as a result of threats sufficient to deter a person of ordinary firmness
from resorting to the grievance procedures," but concluding that "[t]he facts of this case,
however, do not present such a close call."  *See Snyder*, 428 F. App'x at 92.

¶ 31 (citing Pl.'s Dep. Tr. 58–59; Ex. E (Plaintiff's facility history)).)  It was not until July 19, 2011 that Plaintiff was transferred to Southport.  (*Id.* ¶ 33 (citing Schulman Decl. Ex. E (Plaintiff's facility history)).)  Assuming that the putative Fishkill assault occurred in the early hours of May 8, 2011, (*cf. id.* ¶¶ 8–9 (noting Peterson examined Plaintiff at 3:45 am on May 8); Pl.'s Dep. Tr. 16–17 ("Q.  We are talking about late evening into the early hours of May 7th.  A. To the 8th.")), Plaintiff then must still file her grievance within 21 days, or by May 29, 2011 at the latest, *see* 7 N.Y.C.R.R. § 701.5(a)(1), although she could have filed a request for an exception to that time limit until 45 days after the incident, *see id.* § 701.6(g)(1)(i)(a), or, based on a May 8 assault date, until mid-June.  If the superintendent deems the grievance a bona fide harassment issue, the superintendent would render his decision within 25 days of receipt of the grievance, which, even if he received it on May 8, would have occurred well after Plaintiff's May 17 transfer to Five Points.  *See id.* § 701.8(d), (f).  If, however, the superintendent did not so conclude, the IGRC would still have 16 days from the date of the incident—that is, until some point after Plaintiff's transfer to Five Points—to attempt to informally resolve the matter.  *See id.* § 701.5(b)(1).

This timeline compels several conclusions: First, any grievance Plaintiff filed at Fishkill would have been timely; second, no matter when Plaintiff filed her grievance at Fishkill, she would not necessarily know that her grievance had been lost until sometime after her transfer to Five Points; and third, Plaintiff's time to request an exception from the regulations' time limits to file a replacement grievance did not elapse until sometime after her transfer to Five Points, but before her transfer to Southport.  Taken together, this means that if Plaintiff had in fact filed a grievance at Fishkill that was lost, she would need to rely on administrative remedies being available at Five Points in order to pursue her claim.  Given that "administrative remedies

may . . . be deemed unavailable if the plaintiff can demonstrate that other factors—for example, threats from correction officers—rendered a nominally available procedure unavailable as a matter of fact," *Hubbs*, 788 F.3d at 59, and given that Plaintiff alleges that she was assaulted, threatened with a knife, and discouraged from filing grievances, (*see* Am. Compl. 6; Pl.'s Dep. Tr. 119), there exists at least a genuine dispute of material fact surrounding whether administrative remedies were available to Plaintiff, *see, e.g.*, *Hepworth v. Suffolk Cty.*, No. 02-CV-6473, 2006 WL 2844408, at *6 (E.D.N.Y. Sept. 29, 2006) (finding material fact as to unavailability of administrative remedies existed where the inmate claimed he was "physically assaulted in retaliation for previously testifying against corrections officers, and that he was threatened with further violence if he reported anything about the assault [at issue]").[24] Therefore, the Court rejects Defendants' argument that Plaintiff failed to exhaust her administrative remedies.

### III.  Conclusion

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment with respect to Peterson and at this time denies it with respect to the PLRA issue.  Because the "Seventh Amendment does not guarantee a jury trial on factual disputes regarding administrative exhaustion under the PLRA," *Messa v. Goord*, 652 F.3d 305, 310 (2d Cir. 2011) (per curiam), and because "courts in th[e] [Second] Circuit have held pre-trial evidentiary hearings on exhaustion when the question cannot be resolved based on the parties' submissions," *Gomez v.*

---

[24] No argument could be made that Plaintiff's letter to the inspector general demonstrates the availability of administrative remedies at Five Points despite the alleged threats and beatings. "[T]hreats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts."  *Hemphill*, 380 F.3d at 688; *see also Harvey v. Correction Officers 1 through 6*, 612 F. App'x 35, 37 (2d Cir. 2015) (same).

*Chill*, No. 11-CV-6844, 2015 WL 1853110, at \*6 n.3 (S.D.N.Y. Apr. 17, 2015) (collecting

cases), *adopted by* 2015 WL 3862709 (S.D.N.Y. June 9, 2015), the Court will hold an

evidentiary hearing concerning whether Plaintiff's claim may proceed notwithstanding her

apparent failure to exhaust his administrative remedies under the PLRA on April 27, 2016, at

3:00 pm. The Clerk of the Court is respectfully requested to terminate the pending Motion, (Dkt.

No. 102), and remove Manywether—whose name appears on the docket as "Investigator

Manywither"— from the docket pursuant to the Court's memo-endorsements, (*see* Dkt. Nos. 73,

88).

SO ORDERED.

Dated:      March 30, 2016
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE